**LEVER BROTHERS COMPANY, Plaintiff,**

v.

**MATTEL, INC. and Flair Licensing, Inc., Defendants.**

**No. 85 Civ. 1657 (CBM).**

United States District Court, S.D. New York.

May 20, 1985.

---

Fish & Neave by Robert C. Morgan, New York City, for plaintiff.

Reavis & McGrath by Joseph P. Zammit and Ralph C. Dawson, New York City, Reagin & King by Ronald W. Reagin, Los Angeles, Cal., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, Chief Judge.

This is an action for trademark infringement and unfair competition brought pursuant to the Lanham Act, 15 U.S.C. section 1051, et seq., and common law. Plaintiff Lever Brothers Company (Lever) seeks to enjoin sale and distribution of a plush toy product known as "Snuggles the Seal," designed by defendant Flair Licensing Inc. (Flair) and produced by defendant Mattel, Inc. (Mattel). Plaintiff alleges that defendant's product infringes on plaintiff's putative trademark, a teddy bear named "Snuggle" which it created to promote its "Snuggle" fabric softener. Plaintiff asserts that it has invested millions of dollars in its lovable "spokesbear" and urges that there is a likelihood of consumer confusion between "Snuggle" and "Snuggles the Seal."

The court heard oral argument on March 7, 1985 on plaintiff's motion for a temporary restraining order and denied the application at that time. An evidentiary hearing on plaintiff's motion for a preliminary injunction was held on March 11 and 12, 1985. In denying the motion for a preliminary injunction, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Plaintiff Lever is a manufacturer and distributor of fabric softeners and other household products. (Transcript of Preliminary Injunction Hearing at 7). In 1982, Lever introduced a new brand of fabric softener distributed under the registered trademark "Snuggle." (Tr. 13; Exh. 19). Defendant Mattel, the world's largest toy company, distributes plush toys through its "Emotions" division. (Tr. 183). Emotions has, since February 1985, marketed a plush toy baby seal known as "Snuggles the Seal." (Tr. 176, 222). Defendant Flair, an independent licensing contractor, created "Snuggles the Seal" and licensed it to Mattel. (Tr. 187).

### Background on "Snuggle"

Following the success of a similar marketing plan by affiliated European compa-

nies, Lever decided to market a new fabric softener called "Snuggle" with a teddy bear character of the same name. The bear was designed as the centerpiece of the promotion campaign and was intended to have a distinct public identity. The bear character and the "Snuggle" name were chosen because of their universal associations with softness and emotional warmth. (Tr. 8–12). Lever retained Kermit Love, a puppet designer known for his work on television's "Sesame Street," to create the "Snuggle" character. (Tr. 8–12).

Following its introduction in the Milwaukee area in September, 1982, "Snuggle" liquid fabric softener has been marketed in areas comprising approximately 37 percent of United States households. (Tr. 84). Although it has yet to be offered in New York City, "Snuggle" has made significant inroads in the national fabric softener market. (Tr. 12–35). In addition, Lever has marketed "Snuggle" in sheet form in limited markets. (Tr. 32–34).

"Snuggle" bear has appeared on every bottle and box of "Snuggle" sold, and has been featured in extensive television and print advertising for the product. In the television commercials, "Snuggle" bear is the sole speaking character. (Tr. 13–15, 22, 28, 33, 38, 54, Exh. 1–3, 9, 9A). In all, Lever has spent $30 million in promoting "Snuggle" fabric softener. (Exh. 7). Lever has also registered the term "Snuggle" with the Patent and Trademark Office for use in connection with fabric softeners, but has not sought trademark registration for the term in connection with any other product. (Tr. 64–65, Exh. 19).

In connection with its marketing of "Snuggle" fabric softener in each new area, Lever has distributed several different versions of a plush toy bear to capitalize on positive public reaction to the "Snuggle" bear character. In November 1982, Lever sold through direct mail in the Milwaukee area approximately 1000 to 2000 12-inch plush toy bears. These were generic teddy bears manufactured by the Dakin Company to which Lever affixed a plastic "Snuggle" name tag. (Tr. 18–20, Exh. 11).

Lever also distributed 49,600 three inch bears as a promotional gift shrink-wrapped to 96-ounce bottles in the same test market area. (Tr. 20–21, Exh. 5).

Lever then had created for it a six and one half inch version of "Snuggle" bear, which it has offered by mail for cash or for multiple proofs of purchase in each subsequent new market area. (Tr. 24–25, Exh. 4). A total of approximately 311,550 such bears have been distributed to consumers, and Lever has continued to ship the bears to satisfy additional offers. (Tr. 35–36, Exh. 7). An additional 40,000 of this version of the bear have been distributed through children's programs and other channels. In all, Lever has distributed approximately 450,000 bears. (Tr. 38–39).

The "Snuggle" bear character has achieved a significant degree of public recognition in the areas where the fabric softener has been marketed. In August, 1984, after the product had been offered for one year in the Midwest, Lever ran a ten-second commercial and a one-time print advertisement inviting "happy birthday" calls to "Snuggle," costing fifty cents each, at a special number. More than 125,000 people called to wish "Snuggle" bear happy birthday. (Tr. 25–28). In addition, Lever has received approximately 1,000 letters praising "Snuggle" fabric softener and "Snuggle" bear, many of which inquire as to whether "Snuggle" bears are available for purchase. (Exh. 17A–C).

Lever has also marketed a "Snuggle" bear calendar, beach towel, and t-shirt in some areas. Although no reference to any product is made on these items, they were produced in conjunction with the fabric softener marketing campaigns. (Tr. 29–30, 71–73). In addition, "Snuggle" bear has made public appearances at Reading Is Fundamental programs and zoos in several cities, and Lever has produced a public service commercial featuring "Snuggle" bear urging children not to consume household products found under the sink. (Tr. 40–43).

In order further to capitalize on the public affection for the "Snuggle" bear charac-

ter, Lever has been exploring for several months the possibility of licensing a "Snuggle" bear for retail sale. (Tr. 108–09, 133). In this connection, Lever, which has no experience in the toy licensing field, has had preliminary discussions with several licensing consultants (Tr. 110) and has arranged for the Russ Berrie Company to produce several proposed versions of "Snuggle" bear. Although the company has produced 11 prototypes of a bear, none was considered close enough to the Kermit Love original to be considered the true "Snuggle" bear. (Tr. 109–112). Lever's licensing program has not progressed beyond this exploratory stage and will not be in place for several months. (Tr. 127, 133–34).

### Background on "Snuggles the Seal"

Defendant Mattel purveys plush toys and other upscale gift items through its "Emotions" division. (Tr. 182–83). In February 1984, defendant Flair approached Mattel with the concept of marketing a plush toy seal to capitalize on the publicity surrounding public opposition to the annual slaughter of baby seals. A portion of the proceeds from the seal's sales would be donated to a non-profit organization working to eliminate the annual hunt, which humanitarian gesture would in turn generate publicity for Mattel's product. (Tr. 188–89). Mattel ultimately entered into an agreement with the Humane Society of the United States whereby "Snuggles the Seal" has been adopted as the official mascot of the "Save the Seals" campaign, and Mattel donates a dollar to the Society for every purchaser of "Snuggles the Seal" who sends in a prepaid postcard provided with the toy. (Tr. 221).

The name chosen for the seal was one of several ideas, including Sniffles, Snuffles, and Snuggles, developed to alliterate with the word Seal. (Tr. 224). Mattel abandoned Sniffles and Snuffles to avoid conflict with the names of other plush toys on the market. (Tr. 227, 241–43). Although Benjamin Cohen, President of Mattel's Emotions division, saw a "Snuggle" fabric

softener commercial featuring "Snuggle" bear in January 1985, (Tr. 228–29), at no time prior to the original conception, design, or naming of "Snuggles the Seal" was anyone connected with the project aware of Lever's "Snuggle" fabric softener or its bear. (Tr. 228, 277–78).

Mattel began to sell "Snuggles the Seal" in February 1985. (Tr. 218). It has promoted the product through popular and trade advertisements, trade shows, and press conferences. All of the promotion has been tied into the "Save the Seals" campaign (Tr. 211–20). The product is displayed in many gift and department stores in a cardboard display (Exh. B) containing copy which reads: "Snuggle up—and help save the seals." As of the date of the hearing, Mattel had sold 48,000 seals and was shipping between 2,000 and 2,500 a day. (Tr. 222).

### Nature of the Marks and Likelihood of Confusion

The word "Snuggle" means "to cuddle." American Heritage Dictionary (2d ed. 1982). Plaintiff's own marketing manager for fabric softener, David Sharp, testified that the term conjures up images of softness and comfort. (Tr. 67–68). In plaintiff's advertisements, the phrase "snuggly softness" is used to suggest that the fabric softener will make the consumer's clothing soft and comfortable (Exh. 14). Defendant's uncontroverted expert witness, Jay Miller, testified that the term "Snuggle" is used frequently to describe soft or cuddly toys. (Tr. 326, 331–333). Used in this sense, the term is not associated with a single source of origin. (Tr. 333).

Moreover, the term has been used widely in the toy industry as a name or part of a name or designation for various plush toys, dolls, and other products. (Tr. 326). There are currently on the market, *inter alia,* a family of toys known as "Snuggle Bumms Family," (Exh. BA–BG), a series of plush toys named "Snuggables," (Exh. BH–BN), a "Cuddly Snuggable Plush AM Radio," (Exh. BP), and a "Snuggle Up Unicorn," (Exh. BQ). Mattel itself has used the word

or variants on it to describe toys in every one of its catalogues since 1971. (Tr. 290, Exh. AK–AZ). Among Mattel's current products are "Snuggle Baby," a doll (Tr. 307), and "Angel Bunny/Snuggle Bunny," a stuffed rabbit. (Tr. 308). Although defendant Mattel did not offer evidence on the amount of promotion afforded these products, the parties stipulated that the many products produced in court by defendant were all purchased at toy stores in the New York area in the days prior to the preliminary injunction hearing. (Tr. 283).

There are several similarities but also some significant differences between the marks of plaintiff and defendants. The greatest similarity is, quite obviously, in the names, which are quite similar. In addition, both "Snuggle" bear and "Snuggles the Seal" are cute, whimsical plush toy animals. The physical similarities, however, end there.

The parties have stipulated that "Snuggle" bear and "Snuggles the Seal" do not look alike. (Tr. 59–60). In fact, no two versions of "Snuggle" bear himself even look alike. The three versions distributed to the public (Exh. 4, 5, 11) differ in size, color, and facial features, and all three differ from the Kermit Love original which Lever has spent millions of dollars promoting in print and broadcast advertisements. (Exh. 3, 8, 10). Furthermore, the eleven prototypes developed at Lever's request (Exh. 20–30) are each different versions of the classic teddy bear. Neither any of these, nor any of the three already distributed, has won Lever's approval as the true "Snuggle." (Tr. 115).

"Snuggles the Seal," moreover, is plainly different from all the many would-be "Snuggle" bears. Unlike the bears, which are brown, the seal is white. It has distinctive blue eyes, whiskers, no ears, a blue shirt and cap, webbed feet, and a bold "Snuggles the Seal" insignia on its chest, all of which distinguish it from the bears. (Exh. 6). In short, "Snuggles the Seal" is a baby seal, not a teddy bear.

The entire marketing of "Snuggles the Seal" has also been geared to its identity as a seal, particularly through the association with the "Save the Seals" campaign. If "Snuggles the Seal" were perceived as a teddy bear, the entire marketing scheme would be a failure. (Tr. 220–21). The marketing of "Snuggles the Seal," which at $20 is a relatively expensive toy item (Exh. 34), has to date been primarily through upscale gift shops and department stores, where purchasers are likely to be relatively sophisticated. (Tr. 183). Lever's bears, by contrast, have been offered as free or inexpensive premiums in connection with the marketing of fabric softener. (Tr. 17–24). Lever's inchoate marketing plans for "Snuggle" bear may eventually include marketing through similar channels as "Snuggles the Seal" (Tr. 52–54), but there is no evidence that Lever plans to market a toy seal. There is no evidence of any bad faith on the part of defendants or of any actual confusion between "Snuggles the Seal" and "Snuggle Bear."

### Potential Impact of a Preliminary Injunction

There is little or no evidence that the continued sale of "Snuggles the Seal" would harm Lever by interfering with fabric softener sales, promotional uses of the "Snuggle" character, or the licensing plan for "Snuggle." Only Lever's own product manager, Eric Kessler, offered testimony on the harm which "Snuggles the Seal" might inflict on the licensing scheme. (Tr. 113). Mr. Kessler, however, has no expertise in licensing and his conclusory and speculative testimony carries little weight. Lever's licensing plans are still embryonic (Tr. 108–12, 133–34), and there is no evidence of Lever's dollar investment to date in the licensing project.

On the other hand, a preliminary injunction would create a substantial burden for Mattel. Requiring Mattel to change the name of the seal would make existing inventory worthless, since the name is printed on a shirt that is sewn to the body of each seal. (Tr. 245). Moreover, even if Mattel has already sold the $1.5 million worth of inventory that was on hand as of

the preliminary injunction hearing (Tr. 246), an injunction now would interfere with pending orders to customers and substantially damage Mattel's customer good will. (Tr. 244–45). In addition, Mattel's promotional efforts with regard to the "Snuggles the Seal" name would be rendered worthless. (Tr. 246).

## CONCLUSIONS OF LAW

Plaintiff Lever asserts that Mattel's marketing of "Snuggles the Seal" infringes on its trademark "Snuggle" under both Section 32(1) of the Lanham Act, 15 U.S.C. section 1114(1) and common law. Moreover, Lever argues that Mattel's conduct violates the unfair competition provisions of Section 43(a) of the Act, 15 U.S.C. section 1125(a). Lever has moved for a preliminary injunction against the further sale of "Snuggles the Seal" pending trial on the merits of a permanent injunction.

■ The standard to be applied in evaluating a claim for preliminary injunction is well settled. Plaintiff must demonstrate likely irreparable harm and either probable success on the merits or serious questions going to the merits coupled with a balance of hardships tilting decidedly in plaintiff's favor. *See Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 78 (2d Cir.1981). The burden of persuasion is on plaintiff. *Halder v. Avis Rent-a-Car System, Inc.*, 541 F.2d 130, 131 (2d Cir.1976).

■ In trademark and unfair competition cases, the preliminary injunction standard generally boils down to the question of success on the merits: Is plaintiff likely to demonstrate a valid trademark and a likelihood of confusion between defendant's product and that of plaintiff? If a likelihood of confusion is demonstrated, irreparable harm is presumed. *Matter of Vuitton Et Fils S.A.*, 606 F.2d 1, 4 (2d Cir. 1979).

### Validity and Strength of Plaintiff's Mark

■ At the outset, the court notes that plaintiff's trademark registration of "Snuggle" raises a presumption of validity only as to the goods or services for which it is registered. *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 48 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). Since Lever registered "Snuggle" only as a trademark for fabric softener, the mark enjoys no presumption of validity when applied to plush toys, and plaintiff must therefore establish independently that it holds a valid trademark in "Snuggle" as applied to any product other than a fabric softener.

■ Trademarks are classified into four categories: arbitrary, suggestive, descriptive, or generic. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9–11 (2d Cir.1976). Unlike arbitrary or suggestive marks, which are inherently distinctive and entitled to automatic protection, *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 687 F.2d 563, 566 (2d Cir.1982), a descriptive mark can only achieve protection if it is shown to have secondary meaning. *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979); *Abercrombie & Fitch*, 537 F.2d at 9. A trademark can be classified in different categories for different uses. *Id.*

Plaintiff has made a strong case that "Snuggle" is a suggestive trademark as applied to fabric softener. The "Snuggle" advertising campaign conveys the message that "Snuggle" will make the consumer's clothing "snuggly soft" and comfortable; thus the name *suggests* indirectly a result from using the product, but does not *describe* the product directly. The mark is unique in its field, and Lever has demonstrated persuasively that its brand of fabric softener and its cuddly "Snuggle" bear have achieved significant consumer recognition.

■ The question before the court, however, is different: Does Lever also possess a strong trademark in the "Snuggle" bear apart from its role as "spokesbear" for fabric softener? Secondary meaning in a trademark as applied to one product does not automatically establish secondary meaning in an unrelated field. *Scott Pa-*

*per Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225 (3d Cir.1978); *Abercrombie & Fitch,* 537 F.2d at 9. Lever has not made a persuasive showing on this more difficult question, and the court finds that plaintiff's trademark in "Snuggle" in the plush toy field is weak, if it is protectable at all.

In comparing the two uses of plaintiff's "Snuggle" mark, the court notes an important distinction: As applied to a fabric softener, Lever's mark consists of a bear *plus* the name "Snuggle"—a unique combination in the fabric softener field. When seeking trademark status for its plush toy, however, plaintiff must rely on the distinctiveness of the name "Snuggle" alone, since the teddy bear itself is a fixture in the stuffed animal field. There has been no showing that any of the bears distributed by Lever are uniquely recognizable as "Snuggle" bear; Lever claims not yet to have produced the "true" version of "Snuggle," and the court has found that the various generic teddy bears distributed and developed by Lever each look different from each other and from the Kermit Love design that has appeared in "Snuggle" fabric softener advertising. Plaintiff, therefore, must demonstrate that the name "Snuggle," by itself, is a valid trademark as applied to teddy bears.

Moreover, the court finds that "Snuggle" as a trademark for a teddy bear is merely descriptive and cannot be protected without a showing of secondary meaning. The word "snuggle," which means "to cuddle" and which conjures up images of softness and warmth, is directly descriptive of the classic teddy bear. Since the product itself is "snuggly," the term must be regarded as descriptive. In contrast, fabric softener is not *itself* "snuggly," so the term is merely suggestive in that context.

■ Plaintiff has failed to demonstrate strong secondary meaning in "Snuggle" as a trademark for plush toys. Although Lever has expended great sums to promote its fabric softener, it has made only a tentative entry into the plush toy field. Most of its bear distribution to date has been in direct connection with promoting its fabric

softener. Plaintiff's inchoate private plans to license a toy bear do not give it any trademark rights beyond those created by its actual public use of the trademark to date. Lever did offer evidence of "Snuggle" bear's independent identity as reflected in the character's personal appearances and the many letters and birthday phone calls. Therefore, arguably, "Snuggle" has begun to take on some secondary meaning as applied to a teddy bear. The court is not persuaded, however, that such secondary meaning is strong enough to give Lever an automatic trademark right to the term as applied to all plush toys.

This conclusion is strengthened by reference to the many uses of "snuggle" variants to describe plush toys, dolls, and other children's products. Secondary meaning is negated by evidence that others are using a term descriptively on related goods. *Tektronix, Inc. v. Daktronics, Inc.,* 534 F.2d 915 (C.C.P.A.1976). Specific variants of "snuggle"—such as "Snuggle Baby" and "Snuggle Bunny"—or for that matter "Snuggles the Seal"—may acquire secondary meaning and achieve trademark protection. The court doubts, however, whether "Snuggle" alone could ever gain this status, since the term in and of itself is virtually generic. Even if Lever could protect its use of "Snuggle" as applied to a *bear* —protection that would be easier to justify if the trademark were "Snuggle Bear" rather than simply "Snuggle"—it cannot thereby claim a trademark in the term as applied to all plush toys.

*Likelihood of Confusion*

■ Even assuming, *arguendo,* that plaintiff holds some rights in the trademark "Snuggle" as applied to a plush toy bear, Lever must show infringement of that trademark in order to gain relief against Mattel. The test of trademark infringement is whether there is a likelihood of consumer confusion between the marks of plaintiff and defendant. *Standard & Poors Corp. v. Commodity Exchange, Inc.,* 683 F.2d 704, 708 (2d Cir.1982). In the absence of a likelihood of confusion,

plaintiff can demonstrate neither a likelihood of success on the merits nor irreparable harm, and therefore cannot obtain an order enjoining distribution of "Snuggles the Seal."

■ Likelihood of confusion is measured under several factors, including strength of the senior mark, similarity of the marks, proximity of the products, actual confusion, good faith of the junior user, and sophistication of the expected consumers. *See, e.g., Standard & Poors,* 683 F.2d at 708; *McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1130 (2d Cir.1979); *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Application of these factors to the facts of this case shows that plaintiff has failed to establish a likelihood of confusion.

The first factor, the strength of plaintiff's mark, has been addressed above, and the court has concluded that Lever possesses, at best, a weak mark in "Snuggle" as applied to plush toys. Plaintiff argues that the court should not rely upon evidence that variations on "Snuggle" are frequently used to describe toys. Although evidence of similar third party marks does not by itself reduce the strength of Lever's trademark, *see Scarves by Vera, Inc. v. Todo Inports Ltd. (Inc.),* 544 F.2d 1167 (2d Cir.1976), defendants here submitted uncontroverted evidence that the third party "Snuggle" variants were actually used to describe toys available in New York stores and advertised in Mattel's national catelogues for the last 15 years. Moreover, unlike the third party marks held not to weaken the senior mark in *Scarves by Vera,* 544 F.2d at 1173, the evidence showed that "Snuggle" variants are commonly used in the same or closely related fields: plush toys and dolls. In the absence of more persuasive evidence that the mark "Snuggle," by itself, is uniquely identified in the public mind with plaintiff's plush toy bear, rather than plaintiff's fabric softener, the court finds that plaintiff possesses only a weak mark in "Snuggle" as applied to a bear.

The second factor, the similarity of the marks, also weighs in Mattel's favor. Although "Snuggle" and "Snuggles the Seal" are similar names, they are no more so than "Snuggle" and "Snuggle Baby" or "Snuggle Bunny"—both of which Lever concedes to be non-infringing marks. Moreover, the court has already found that "Snuggle" bear, so far as he has been marketed to date as a plush toy, lacks a clear physical identity, and in any event is remarkably different in appearance from "Snuggles the Seal." Mattel's seal-oriented promotional campaign underscores the differences between the products and correspondingly reduces the accompanying likelihood of confusion. The overall impression created by these products and their accompanying trademarks is, therefore, quite dissimilar. *See McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1134 (2d Cir.1979).

The proximity of plaintiff's and defendant's products has been marginal to date. Plaintiff's bears have been distributed as promotional gifts or inexpensive premiums, while defendant's seal has been sold in upscale gift shops and department stores. Plaintiff argues, however, that it retains the right to change its marketing channels. *Russell Chemical Co. v. Wyandotte Chemicals Corp.,* 337 F.2d 660, 662 (C.C.P.A. 1964). Nevertheless, even if "Snuggle" bear were sold in the same stores as "Snuggles the Seal," the court doubts whether this would significantly augment the likelihood of consumer confusion.

■ Moreover, while a trademark holder may enjoin infringements by products even in totally unrelated fields where a likelihood of confusion as to sponsorship exists, *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2d Cir.1981), Lever, as holder of at best a weak mark, can wield no such far-ranging control. Plaintiff therefore must otherwise bridge the gap between defendant's product and its own. Even assuming that plaintiff can demonstrate that it and defendant are in the same business, i.e. plush toys, plaintiff's weak

mark still fails to bridge the gap between plush toy bears and plush toy seals.

As the court has concluded, there is no evidence of bad faith on the part of Mattel. "Snuggles the Seal" was conceived, developed, and named without knowledge of "Snuggle" bear, and Mattel's consistent intention to exploit public concern about the killing of baby seals in its marketing of "Snuggles the Seal" belies any desire to confuse the public by riding on "Snuggle" bear's coattails.

In addition, there is no evidence of actual confusion. Although such evidence would be highly probative of likelihood of confusion, its absence does not necessarily bar injunctive relief, where, as here, defendants have only been marketing their product for a short time. *Scarves by Vera*, 544 F.2d at 1175. In the absence of positive evidence, however, this factor is a "wash."

Finally, the relatively high price of "Snuggles the Seal" and its marketing through upscale outlets suggests that it will be purchased by relatively sophisticated consumers, particularly in view of its promotion in connection with the "Save the Seals" campaign. Were plaintiff's mark stronger, or plaintiff's and defendant's products more similar, this factor alone might be insufficient to negate the likelihood of confusion. In view of the foregoing discussion, however, the comparative sophistication of defendant's customers militates against a finding of likelihood of confusion.

Application of the foregoing factors leads the court to the inescapable conclusion that plaintiff has failed to demonstrate a likelihood of consumer confusion between "Snuggles the Seal" and "Snuggle" bear. Lever possesses a strong trademark in a bear named "Snuggle" used for fabric softener, but only a weak mark in "Snuggle" as a name for a plush toy teddy bear. In view of significant differences in the names, physical appearances, and marketing of Lever's and Mattel's products, defendant is guilty of no infringement of plaintiff's weak mark.

Plaintiff's failure to show a likelihood of confusion means that he also lacks a likelihood of success on the merits and has failed to demonstrate irreparable harm. Moreover, while there are arguably serious litigable issues going to the merits, the balance of hardships does not tilt decidedly in Lever's favor. Any direct competition between the parties' products is primarily in the future and the harm to plaintiff's intended licensing program has been suggested only by the most speculative and conclusory testimony. In contrast, a preliminary injunction would do severe damage to Mattel's relationship with its customers and would render Mattel's investment in promoting the "Snuggles the Seal" name virtually worthless. Therefore, under all the relevant standards, plaintiff has failed to meet its burden in justifying a preliminary injunction.

For the foregoing reasons, plaintiff's motion for a preliminary injunction is denied.