Nolan RYAN, Plaintiff

v.

**VOLPONE STAMP COMPANY, INC.,**
**d/b/a Sport Stamps Collectors**
**Association, Defendant.**

No. 99Civ.9116 (CSH).

United States District Court,
S.D. New York.

Aug. 1, 2000.

Golenbock, Eiseman, Assor & Bell, New York, NY (Martin S. Hyman, Joel S. Tennenberg, of counsel), for Plaintiff.

Feder Kaszovitz Isaacson Weber Skala & Bass LLP, New York, NY (Ezio Scaldaferri, Bruce Robins, of counsel), for defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

This action arises out of a dispute between a licensor and ex-licensee over the use of former Major League Baseball pitcher Nolan Ryan's name, likeness and signature in association with the sale of several products including stamps, coins, teddy bears, model trains and autographed items. Plaintiff Nolan Ryan brought this action under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), New York Civil Rights Law §§ 50–51, and applicable common law alleging, *inter alia*, trademark infringement and breach of contract.

Plaintiff moves for a preliminary injunction enjoining and restraining Defendant from manufacturing, causing to be manufactured, selling, causing to be sold, licensing or otherwise exploiting any products bearing Nolan Ryan's image. Defendant cross-moves to dismiss the action in deference to the pending New York State Court action between the parties, or in the alternative pursuant to Rules 12(c) and 19(b) of the Federal Rules of Civil Procedure.

## I. *BACKGROUND*

Plaintiff Nolan Ryan, a former Major League Baseball player, pitched seven no hitters during his career and continues to hold the record for most strikeouts. He was inducted into the Baseball Hall of Fame and voted by fans onto Baseball's All–Century Team. In light of his accomplishments and illustrious career, Ryan currently derives substantial revenue from endorsements, commercials, and the licensing of his name and image. Ryan is represented with respect to these matters by his agent Mattgo Enterprises, Inc. ("Mattgo"), a New York corporation. Matt Merola is the president of Mattgo. Neither Mattgo nor Merola are currently parties to this action.

Defendant Volpone Stamp Company, Inc. d/b/a Sport Stamps Collectors Association ("Volpone") is in the business of selling sports-related merchandise. Bernie Neumark is the president of Volpone.

In 1998 Ryan through Mattgo entered into a licensing agreement with Volpone (the "Master Agreement"). The Master Agreement was dated March 2, 1998 and was signed by Neumark for Volpone, Merola for Mattgo, and Ryan himself. (Defendant Notice of Motion, Exh. A). The Master Agreement granted Volpone exclusive rights to manufacture, sell, and sub-license numerous Nolan Ryan products, including, stamps, coins and medals, cards and all products with facsimile Nolan Ryan

signatures. It also granted Volpone nonexclusive rights ·with respect to two styles of watches as well as plates and figurines. The Master Agreement was for a term of two years with an effective starting date of January 1998. In return Volpone promised to pay royalties equal to ten percent of its wholesale price and guaranteed minimum royalties of $150,000 the first year and $175,000 the second year to be paid according to a schedule outlined in the Master Agreement. The Master Agreement also provided that Ryan would personally sign an unlimited quantity of baseballs at $25 per item, and an unlimited quantity of cards, flats and stamps at $20 per item. Finally, in case of nonpayment of the minimum royalties, Volpone would have sixty days to cure any default, after which the Master Agreement would terminate and all licensing rights would revert to Mattgo.

On September 23, 1998, a second agreement was entered into expanding Volpone's rights (the "Train Set Agreement"). The Train Set Agreement, signed by Neumark for Volpone, Merola, and Ryan, granted Volpone an exclusive license for Nolan Ryan train sets. (Defendant Notice of Motion, Exh. A). This contract required royalty payments amounting to twelve percent of wholesale sales and guaranteed a minimum payment of $5,000 due on March 31, 1999. Absent a written extension, the license expired by its own terms on December 31, 1999.

On November 23, 1998, the third and final agreement between the parties was executed granting Volpone the license to manufacture, sell and sub-license Nolan Ryan Plush Teddy Bears (the "Teddy Bear Agreement"). This contract required royalty payments amounting to ten percent of wholesale sales and guaranteed a minimum payment of $5,000 due on June 30, 1999. The Teddy Bear Agreement also expired on December 31, 1999. (Defendant Notice of Motion, Exh. A).[1]

---

**1.** I will refer at times to the three agreements collectively as the "license" or the "licensing agreements."

The instant action arises out of a dispute that began in the Summer of 1999. In accordance with the Master Agreement and the Teddy Bear Agreement, Volpone delivered checks covering its minimum guarantee payments in late June 1999. Specifically, he tendered two checks payable to Mattgo in the amounts of $43,750 (the second quarterly minimum guarantee payment for 1999 under the Master Agreement) and $5,000 (the minimum guarantee payment due under the Teddy Bear Agreement). Although the payments were due no later than June 30, 1999, both checks were post-dated July 31, 1999. According to Merola, Mattgo accepted the post-dated checks as an accommodation to Neumark. Merola deposited the post-dated checks on August 2, 1999. The checks were returned for insufficient funds. Volpone claims that payment was deliberately stopped.

Sometime in July 1999, Ryan autographed numerous items, including baseballs and photos, for Volpone in accordance with the Master Agreement. Volpone then tendered two additional checks compensating Ryan according to the rates agreed upon. One of the two checks was made payable to Nolan Ryan in the amount of $38,035. The other check was made payable to the Nolan Ryan Foundation in the amount of $2,117; this check represented a nominal fee for the Foundation's services in facilitating the signing of the objects and delivery of the items to Volpone. Thereafter payment was stopped on both checks.

Volpone justifies its actions based on the belief that Plaintiff had breached the Master Agreement which granted Volpone exclusive rights to Ryan's name, image and facsimile signature with respect to several products. As early as April 15, 1999, Neumark sent a letter to Merola expressing concern that the Master Agreement had been breached or that other companies were selling unauthorized merchandise. (Neumark Aff., Exh. B).

Not surprisingly, the parties dispute what happened next. Merola claims that he asked Neumark to provide specific information regarding his allegations so that he could investigate. Neumark allegedly failed to provide further information or return Merola's calls. According to Neumark, Merola promised to make inquiries but never followed up or reported back to him.

Neumark sent another letter to Merola dated July 28, 1999 demanding a list of all licensing agreements Mattgo had made for Nolan Ryan products. (Neumark Aff., Exh. H). He also requested that Merola not deposit the outstanding checks until the matter was resolved. Merola did not heed his plea and deposited the checks on August 2, 1999. Nevertheless, as previously stated, Volpone never made good on any of the four checks tendered in June and July 1999. On August 9, 1999, Neumark informed Merola by letter that he had stopped payment on the checks made payable to Nolan Ryan and the Nolan Ryan Foundation because Merola disregarded his request not to deposit the checks made out to Mattgo. (Neumark Aff., Exh. H). He also reiterated his request for the list of licensing agreements Mattgo has made for Nolan Ryan products.

On August 10, 1999 counsel for Ryan wrote a letter to Volpone stating that its allegations concerning violations of the Master Agreement did not justify its failure to make the minimum guarantee payments. (Hyman Aff., Exh. A). Such failure to pay, the letter continued, constituted a breach of the licensing agreements, and, therefore, the letter was to serve as notice that the licensing agreements were terminated. The letter stated in no uncertain terms that Volpone was no longer authorized to "manufacture, cause to be manufactured, sell, market or otherwise distribute or promote any products bearing Nolan Ryan's name, photograph, signature, image, etc." *Id.* Plaintiff alleges that Volpone disre-

garded the termination letter and continued to manufacture and distribute Nolan Ryan merchandise.

On August 16, 1999, Volpone commenced an action against Ryan, Merola and Mattgo in New York State Supreme Court asserting claims of breach of contract and fraud. Plaintiff commenced the present action in this Court on August 24, 1999.

Believing that Defendant continued to market Nolan Ryan products even after the commencement of litigation by both sides to this dispute, counsel for Plaintiff sent another cease and desist letter dated October 7, 1999, this time addressed to counsel for Defendant. (Hyman Aff., Exh. B). Plaintiff alleges that Defendant has failed to comply and now moves for a preliminary injunction pursuant to Fed. R.Civ.P. 65(a) enjoining Volpone from continuing to manufacture, sell, distribute and otherwise market Nolan Ryan products. It also moves this Court to direct Defendant to certify its compliance and account for its sales and revenue relating to Nolan Ryan items.

Defendant cross-moves to dismiss the action in its entirety in deference to the action between the parties pending in the state court. Alternatively, Defendant moves to dismiss the complaint pursuant to Fed.R.Civ.P. 12(c) for lack of subject matter jurisdiction and pursuant to Fed. R.Civ.P. 19(b) for nonjoinder of indispensable parties. As a further alternative, Defendant moves to dismiss the first, second and, eighth causes of action pursuant to Rule 12(c) for failure to state a cause of action upon which relief can be granted.[2]

## II. SUBJECT MATTER JURISDICTION

Since it is a threshold matter and necessary prerequisite to my taking any action with respect to this case, I begin my analysis with Defendant's challenge to this Court's subject matter jurisdiction. As it currently stands, there are two alleged bases for this Court's jurisdiction over the instant action. The first basis arises under the laws of the United States relating to trademarks, namely section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which pursuant to 28 U.S.C. § 1338 confers federal question jurisdiction. Pursuant to 28 U.S.C. § 1332, this Court also has jurisdiction of this matter on the basis of diversity of citizenship among the parties. Both are under attack by Defendant. Therefore, I will examine each in turn.

### A. Federal Question Jurisdiction

28 U.S.C. § 1338(a) provides in pertinent part:

(a) The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.[3]

---

**2.** "[A] defense of failure to state a claim upon which relief may be granted, typically raised pursuant to Rule 12(b)(6), can be made after an answer has been filed by moving for judgment on the pleadings pursuant to Rule 12(c)....[Nevertheless], the Second Circuit has instructed that the same standards that are employed for dismissing a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) are applicable on a motion to dismiss the complaint under Rule 12(c) for failure to state a claim." *Jenkins v. Sea–Land Service, Inc.,* 1993 WL 33406 at 1–2 (S.D.N.Y.1993) (citations and internal quotations omitted). Following the filing of an answer, a motion to dismiss for lack of subject matter jurisdiction may also be raised pursuant to Rule 12(c).

Although ordinarily such a motion is raised pursuant to Rule 12(b)(1), as with a Rule 12(b)(6) motion, the same standards are applied when the motion is made under Rule 12(c). *See, e.g., U.S. v. New Silver Palace Restaurant, Inc.,* 810 F.Supp. 440, 441 (E.D.N.Y.1992).

**3.** Although federal courts are granted exclusive jurisdiction with respect to patent, plant variety protection and copyright cases, the state courts enjoy concurrent jurisdiction with the federal courts over trademark, i.e. Lanham Act, claims. *See Foxrun Workshop, Ltd. v. Klone Manufacturing, Inc.,* 686 F.Supp. 86, 87 n. 3 (S.D.N.Y.1988).

The first claim of the complaint asserts a violation of the Lanham Act, and, therefore, this Court's subject matter jurisdiction seems a foregone conclusion. However, "[i]t is well-established that not every complaint that refers to the Copyright Act 'arises under' that law for purposes of Section 1338(a)." *Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343, 347 (2nd Cir. 2000).[4] Where, as in the instant case, a plaintiff's claims straddle the line between trademark infringement and common law breach of contract, courts have long struggled to determine, as a threshold matter, what lies at the heart of the dispute: questions of federal law, state law questions of contract, or both. That struggle is evident from its description by Judges who have tackled the issue: "Whether a complaint asserting factually related copyright and contract claims arises under the federal copyright laws for purposes of Section 1338(a) poses among the knottiest procedural problems in copyright jurisprudence." *Bassett*, 204 F.3d at 347 (citation and internal quotations omitted); "The question of whether the breach of a contract licensing or assigning a copyright gives rise to a federal cause of action under the Copyright Act is a complex issue in a 'murky' area." *Schoenberg v. Shapolsky Publishers, Inc.*, 971 F.2d 926, 931 (2nd Cir.1992); "Whether a case arises under the patent laws has been called one of the darkest corridors of the law of federal courts and federal jurisdiction." 13B C. Wright, A. Miller and E. Cooper, Federal Practice & Procedure § 3582, at 307 n. 11 (1984) (citation and internal quotations omitted).

█ The difficult analysis required in such cases has, not surprisingly, led to diverse results. Although it vastly simplifies the evolution of the body of law on this discrete point, it is sufficient to state that, until recently, the courts in this circuit were roughly divided into two camps. The first line of cases is descended from Judge Friendly's decision in *T.B. Harms Company v. Eliscu*, 339 F.2d 823 (2nd Cir.1964), in which he formulated a standard for determining subject matter jurisdiction in cases like the present action as follows:

> Mindful of the hazards of formulation in this treacherous area, we think that an action 'arises under' the Copyright Act if and only if the complaint is for a remedy expressly granted by the Act, e.g., a suit for infringement ... or asserts a claim requiring construction of the Act ... or, at the very least, and perhaps more doubtfully, presents a case where a distinctive policy of the Act requires that federal principles control the disposition of the claim.

*Id.* at 828 (internal citations omitted). In contrast to the *T.B. Harms* face of the complaint test, the second line of cases applies an essence of the dispute test and looks beyond the complaint in an effort to determine whether the copyright or trademark claims are merely incidental to the contract action. This approach was crystallized in *Schoenberg v. Shapolsky Publishers, Inc.*, 971 F.2d 926 (2nd Cir.1992). In *Schoenberg* the Second Circuit announced a new three part test which purported to synthesize the approaches taken in *T.B. Harms* and subsequent cases which expanded on Judge Friendly's formulation:

> A district court must first ascertain whether the plaintiff's infringement claim is only incidental to the plaintiff's claim seeking a determination of ownership or contractual rights under the copyright ... If it is determined that the claim is not merely incidental, then a district court must next determine whether the complaint alleges a breach of a condition to, or a covenant of, the contract licensing or assigning the copyright. As we noted above, if a breach of a condition is alleged, then the district court has subject matter jurisdiction.

4. For the purposes of determining subject matter jurisdiction, and with the exception of whether such jurisdiction is exclusive, *see supra* note 3, "analogous principles apply to copyrights, patents, and trademarks." *Foxrun Workshop*, 686 F.Supp. at 87.

But if the complaint merely alleges a breach of a contractual covenant in the agreement that licenses or assigns the copyright, then the court must undertake a third step and analyze whether the breach is so material as to create a right of rescission in the grantor. If the breach would create a right of rescission, then the asserted claim arises under the Copyright Act.

*Id.* at 932–933 (internal citations omitted). Although *Schoenberg* relied, at least in part, on *T.B. Harms*, the new standard was quite different from, if not contrary to, the approach endorsed by Judge Friendly.

This tortured history notwithstanding, or perhaps because of it, the Second Circuit has recently revisited the subject and clarified its position. In its opinion in *Bassett v. Mashantucket Pequot Tribe*, 204 F.3d 343 (2nd Cir.2000), the Court of Appeals abrogated its reasoning in *Schoenberg*, declaring the essence of the dispute test "unworkable." *Id.* at 352. The Court of Appeals opted instead to reaffirm the standard as formulated by Judge Friendly in *T.B. Harms*, making clear that courts are to apply a face of the complaint test for the purposes of determining subject matter jurisdiction. In *Bassett*, the Court held that it did have subject matter jurisdiction "because the complaint alleges the defendants violated the Copyright Act and seeks the injunctive remedy provided by the Act." *Id.* at 355–356. The Court also noted that hybrid copyright/contract claims "characteristically arise where the defendant held a license to exploit the plaintiff's copyright, but is alleged to have forfeited the license by breaching the terms of the licensing contract and thus to infringe in any further exploitation." *Id.* at 347. Thus, with the exception of substituting trademark for copyright, the analysis in *Bassett* is readily applicable to the case at bar.

Cases in this district have already employed the various tests for subject matter jurisdiction in copyright cases to Lanham Act claims. *See, e.g., TGI Friday's Inc. v. National Restaurants Management, Inc.,* 1992 WL 164445 (S.D.N.Y.1992)(exercising subject matter jurisdiction under *T.B. Harms* where plaintiff alleged trademark infringement and sought remedies expressly granted by the Lanham Act); *Foxrun Workshop, Ltd. v. Klone Manufacturing, Inc.,* 686 F.Supp. 86 (S.D.N.Y. 1988)(same). Applying *T.B. Harms* to the case at bar, and in accordance with the Second Circuit's decision in *Bassett*, it is clear that this Court has subject matter jurisdiction over Plaintiff's Lanham Act claim pursuant to 28 U.S.C. § 1338. The first claim asserted in the complaint is for trademark infringement. Pursuant to 15 U.S.C. §§ 1125, 1116 and 1117, Plaintiff seeks remedies expressly granted by the Lanham Act, including an injunction and money damages. "Where a complaint alleges a federally conferred right, such as a copyright, a trademark or a patent, then alleges violations of that right and requests remedies provided by federal statute, this should be enough to confer federal jurisdiction. The fact that such a claim arises in the context of a disruption of contractual arrangements and presents certain contract issues should not remove it from that jurisdiction." *Daniel Wilson Productions, Inc. v. Time–Life Films, Inc.,* 736 F.Supp. 40, 43 (S.D.N.Y.1990). Thus, Plaintiff's additional claims for breach of contract and violations of New York State statutory law notwithstanding, his assertion of a claim for infringement and prayer for remedies expressly granted by the Lanham Act is sufficient to confer subject matter jurisdiction upon this Court. Accordingly, Defendant's motion to dismiss this action for lack of subject matter jurisdiction with respect to the Lanham Act claim is denied.

### B. *Diversity Jurisdiction*

This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 on the basis of diversity. However, Defendant contests this Court's diversity jurisdiction, arguing that Merola and Mattgo are indispensable parties whose joinder as

plaintiffs would defeat diversity.[5] As indispensable parties and in the absence of diversity of citizenship among the parties, Defendant argues that I must dismiss the action pursuant to Fed.R.Civ.P. 19(b). However, it is well-established that "[i]n cases where a district court has original jurisdiction, it may also exercise 'supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.' 28 U.S.C. § 1367(a)." *Viacom International, Inc. v. Kearney*, 212 F.3d 721, 726–27 (2nd Cir.2000). "Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." 28 U.S.C. § 1367(a). Defendant's motion to dismiss for failure to join indispensable parties is contingent on a finding that I lack subject matter jurisdiction over the matter based on the Lanham Act claim or that the Lanham Act claim must be dismissed for failure to state a cause of action, such that diversity would remain the only basis for jurisdiction.[6] Having found that this action arises, in part, under the federal trademark laws for purposes of establishing subject matter jurisdiction pursuant to 28 U.S.C. § 1338, I need not rely on diversity as a basis for this Court's jurisdiction.

If Mattgo and Merola are, in fact, necessary parties, they may be joined pursuant to Rule 19(a). However, before conducting a Rule 19 analysis, I must first address Defendant's alternative motion to dismiss the Lanham Act claim pursuant to Rule 12(c) for failure to state a cause of action, for if I were to dismiss the trademark claim on that basis, diversity of citizenship would become the sole basis for this Court's subject matter jurisdiction and Rule 19(b) might provide cause for dismissal.

### III. *LANHAM ACT CLAIM*

The fact that this Court has subject matter jurisdiction does not necessarily mean that Plaintiff has stated a viable cause of action under the Lanham Act. Defendant has moved in the alternative to dismiss the Lanham Act claim pursuant to Fed.R.Civ.P. 12(c) for failure to state a cause of action. I now address the merits of that motion.

On a motion to dismiss under Rule 12(b)(6), or in this case under Rule 12(c),[7] the trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2nd Cir.1980); *see Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 124 (2nd Cir.1991). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The district court

---

**5.** Both Merola and Mattgo are citizens of New York as is the Defendant.

**6.** Defendant proceeds on the theory that assuming arguendo that I were to dismiss the Lanham Act claim for lack of subject matter jurisdiction or failure to state a cause of action, diversity of citizenship would be the only remaining basis for this Court's jurisdiction. While Defendant is correct, the reasons are different depending on the grounds for dismissal of the federal claim. If I found that this Court lacked subject matter jurisdiction pursuant to 28 U.S.C. § 1338, diversity must exist for this Court to exercise jurisdiction over this matter, as all other claims asserted by Plaintiff are state law claims. However, if

I were to dismiss the Lanham Act claim for failure to state a claim upon which relief can be granted, 28 U.S.C. § 1367(c)(3) leaves it within my discretion whether to exercise supplemental jurisdiction over the state law claims after having dismissed all claims over which this Court had original jurisdiction. That power notwithstanding, where the Lanham Act claim is dismissed upon motion, the state law claims should be dismissed without prejudice, assuming there is no alternative basis for original jurisdiction, i.e. diversity. *See Sun Trading Distributing Co., Inc. v. Evidence Music, Inc.*, 980 F.Supp. 722, 730 (S.D.N.Y.1997) (citing cases).

**7.** *See* discussion *supra* note 2.

should grant a Rule 12(b)(6)/12(c) motion "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)(*citing Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Consideration of a motion to dismiss for failure to state a claim upon which relief can be granted ordinarily focuses on the allegations contained on the face of the complaint. *See Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2nd Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2nd Cir.1991). On a motion to dismiss, a district court must accept plaintiff's well-pleaded factual allegations as true, *Papasan v. Allain,* 478 U.S. 265, 283, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), and the allegations must be "construed favorably to the plaintiff." *LaBounty v. Adler,* 933 F.2d 121, 123 (2nd Cir.1991). However, a court may consider documents integral to plaintiff's allegations, even if they are not attached to the pleading or incorporated by reference therein, without converting the motion into one for summary judgment. *See Cortec Industries, Inc.,* 949 F.2d at 47; *see also, I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 762 (2nd Cir.1991)(quoting 5 C. Wright & A. Miller, Federal Practice & Procedure § 1327, at 762–763 and n. 6 (1990))("when 'plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading.'"). "[A] Rule 12(b)(6) motion to dismiss need not be granted nor denied in toto but may be granted as to part of a complaint and denied as to the remainder." *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 115 (2nd Cir.1982).

Plaintiff alleges that he terminated the licensing agreements with Defendant but that the Defendant ignored the termi-nation and demands to cease and desist from engaging in any further manufacture, promotion, distribution or sale of Nolan Ryan products. Consequently, Plaintiff contends that the continued unauthorized production and sale of Nolan Ryan products is likely to cause confusion as to Nolan Ryan's authorization and sponsorship, or lack thereof, with respect to these products, and thus constitutes trademark infringement. Defendant argues that even if the licensing agreements were properly terminated, the production of the goods in question was authorized and did occur prior to termination. As a result, Defendant concludes that these are genuine goods and, therefore, there is no basis for consumer confusion.

■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) provides in pertinent part:

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

■ "To make out a cause of action under the Act, plaintiff must establish three elements: 1) involvement of goods or services, 2) effect on interstate commerce, and 3) a false designation of origin or false description of the goods or services." *Allen v. National Video, Inc.,* 610 F.Supp. 612, 625 (S.D.N.Y.1985). There is no dispute that Plaintiff's allegations satisfy the

first two elements. This case clearly involves various products featuring Nolan Ryan's name, likeness and signature that are sold nationally, if not worldwide, over the internet. The parties do, on the other hand, contest bitterly what is sufficient to establish the requisite likelihood of confusion.

■ Volpone invokes the genuine goods doctrine, arguing that since the goods in question were produced during the term of the license and since the goods were not altered or changed in any way, consumers received exactly what they expected. Defendant is correct that "[a]s a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner." *Polymer Technology Corp. v. Mimran,* 975 F.2d 58, 61 (2nd Cir.1992). However, Defendant's reliance on this rule is misplaced.

As an initial matter, Volpone would have this Court focus only on the goods themselves. As Defendant states in its brief, the Nolan Ryan products "are manufactured and sold exactly as they had been during the term of the Agreements. There is no consumer confusion—consumers think that they are buying a commemorative object with a facsimile of Nolan Ryan's signature, and they are." (Memorandum of Law in Support of Defendant's Cross–Motion to Dismiss and in Opposition to Plaintiff's Motion for Preliminary Injunction, p. 10, n. 8). However, the scope of Section 43(a) of the Lanham Act is not so narrowly construed. "It has been indicated that § 43(a) of the Lanham Act is remedial in nature, and should be interpreted and applied broadly so as to effectuate its remedial purpose." *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2nd Cir.1981); *see also, Allen,* 610 F.Supp. at 625. Volpone conveniently ignores that the statute by its very terms protects against confusion not only with respect to whether the goods are what they purport to be, but with respect to the origin, sponsorship, or approval of those goods by another person, in this case Nolan Ryan. *See* 15 U.S.C. § 1125(a). "The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2nd Cir.1979); *see also, Warner Bros.,* 658 F.2d at 79 (confusion can be premised on likelihood that public will be misled into believing that the defendant is distributing products "vouched for" or sponsored by the plaintiff); *Mastercard International Inc. v. Sprint Communications Co.,* 1994 WL 97097 (S.D.N.Y.1994) (holding that Sprint's unauthorized use of World Cup marks on calling cards conveyed the false impression that such use was "officially sanctioned by the World Cup organization," thereby constituting a violation of the Lanham Act); *Geisel v. Poynter Products Inc.,* 283 F.Supp. 261, 267 (S.D.N.Y.1968) ("a 'false representation', whether express or implied, that a product was authorized or approved by a particular person is actionable under Section 43(a)").

Plaintiff has clearly alleged in his complaint that "[Volpone] intended to suggest, and has falsely suggested, that [Volpone's] goods, services or commercial activities were endorsed, sponsored, authorized, or approved by plaintiff in a manner designed to mislead the public." (Complaint ¶ 28). Defendant relies on the fact that the products exhibit a genuine Nolan Ryan facsimile signature and likeness of Nolan Ryan. Although Defendant is correct that the public cannot be deceived in the sense that the products bear a forged signature or false likeness, there is a likelihood that consumers will assume that Nolan Ryan has authorized the use of his signature and likeness and sponsors, endorses or otherwise approves of these products. Volpone answers this contention by stating that Nolan Ryan did authorize and approve of these products, thereby making them genuine. However, simply because Nolan Ryan authorized the use of his name, sig-

nature and likeness in connection with Volpone's products in the past, does not make his endorsement irrevocable for all time.

Volpone concedes that its unauthorized sales of Nolan Ryan products subsequent to the alleged termination of the agreement might state a cause of action for breach of contract, but not infringement. However, in *Baskin–Robbins Ice Cream Co. v. D & L Ice Cream Co., Inc.*, 576 F.Supp. 1055 (E.D.N.Y.1983), the court held that "the continued use by the defendants of a licensed trademark after the Franchise Agreement had been terminated constitutes . . . trademark infringement as well as a breach of contract." *Id.* at 1060; *see also, Romacorp, Inc. v. TR Acquisition Corp.*, 1993 WL 497969 (S.D.N.Y.1993) (holding that continued use of trademark after termination of franchise for nonpayment of royalties constitutes Lanham Act violation); *S & R Corporation v. Jiffy Lube International, Inc.*, 968 F.2d 371 (3rd Cir.1992) (same). This principle is not limited to franchise agreements. It has been more generally applied in the licensing context. *See, e.g., Dynamic Microprocessor Associates, Inc. v. EKD Computer Sales & Supplies Corp.*, 1997 WL 231496 (E.D.N.Y.1997) (holding that ex-licensee's continued distribution of product after termination of license violated Lanham Act); *Murjani International, Ltd. v. Sun Apparel, Inc.*, 1987 WL 15110 (S.D.N.Y.1987) (defendants' distribution of clothing products bearing 'COKE' and 'COCA–COLA' marks after termination of agreements granting license to use those marks "would engender the false impression that the Coca–Cola Company is the manufacturer of these products and would thereby constitute a trademark infringement").

Although post-termination use of a mark alone does not make out a claim for trademark infringement without first creating the likelihood of consumer confusion, this is more often than not a distinction without a difference. As the Second Circuit has explained:

[a defendant's status as former licensee] increases the probability of consumer confusion. A licensee or franchisee who once possessed authorization to use the trademarks of its licensor or franchisor becomes associated in the public's mind with the trademark holder. When such party, as defendants here, loses its authorization yet continues to use the mark, the potential for consumer confusion is greater than in the case of a random infringer. Consumers have already associated some significant source identification with the licensor. In this way the use of a mark by a former licensee confuses and defrauds the public.

*Church of Scientology International v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2nd Cir.1986) (finding likelihood of consumer confusion where local branch of international religious organization continued to operate after its license was terminated).

■ Defendant distinguishes the case at bar by arguing that since the goods sold after the alleged termination of the license were manufactured prior to that termination, they are genuine goods. Thus, Volpone concludes, it is unlike the continued operation of a franchise after termination, and there can be no consumer confusion with respect to those goods as a matter of law. However, the genuine goods defense to trademark infringement only arises where the first sale rule or exhaustion doctrine has already come into play. The exhaustion doctrine states that, " 'with certain well defined exceptions, the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product. Resale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition.' " *Rogers v. HSN Direct Joint Venture*, 1999 WL 728651 *2 (S.D.N.Y.1999) (quoting *Sebastian, Int'l, Inc. v. Longs Drug Stores, Corp.*, 53 F.3d 1073, 1074 (9th Cir.1995)).

Defendant erroneously concentrates on the date the goods were manufactured rather than whether their subsequent sale was authorized. As the court explained in *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 979 F.Supp. 224 (S.D.N.Y. 1997):

> It is well settled that sale of genuine goods without authorization by the trademark holder generally will not constitute trademark infringement ... Such cases, however, usually arise when the initial sale of the trademarked goods was authorized, and the second or subsequent sale is contested. At that juncture, the first sale is exhausted ... The question of whether a good is genuine, however, presupposes the initial sale was authorized. As commented on in the Restatement: "Trademarked goods produced by a manufacturer under contract with the trademark owner are not genuine goods until their sale under the mark is authorized by the trademark owner. Thus, if the trademark owner rejects the goods, the manufacturer may not use the mark in reselling the goods to others." Restatement (Third) of Unfair Competition § 24, comment c (1995).

*Id.* at 230. Accordingly, a court faced with an infringement claim for unauthorized sales of a trademarked product must perform a two-part analysis. First, the court must consider whether the trademark owner authorized the first sale of the goods. Second, the court must consider whether the goods were genuine. If the initial sale was authorized, the court must undertake the second part of the analysis and determine whether, as a matter of fact, the goods which were later resold without authorization were genuine. If the goods were genuine, there is no violation of the Lanham Act despite the fact that the goods were resold without the

trademark owner's consent. If the goods were not genuine, that is altered or not in keeping with the trademark owner's quality standards, a valid claim for trademark infringement is established. If the trademark owner did not approve the original sale, the goods cannot be considered genuine as a matter of law and infringement is established.

In *Liz Claiborne*, the plaintiff, an apparel designer, hired the defendant, Mademoiselle, as a contractor to manufacture merchandise on its behalf. A dispute arose over the defendant's authority to sell overruns, goods that met plaintiff's quality standards but exceeded the quantity ordered by a certain percentage. Defendant claimed that the goods were genuine and, thus, that the sale of such goods could not constitute trademark infringement, even if the sales themselves were unauthorized. However, the court disagreed, holding that "[i]f the first sale by Mademoiselle was not authorized, then the garments cannot be genuine for infringement purposes." *Id.* at 231.[8]

█ *Rogers v. HSN Direct Joint Venture*, 1999 WL 728651 (S.D.N.Y.1999) is even more on point. In *Rogers*, "HSNDI", the owner of a trademark used in association with a hair removal and body smoothing system, granted a license to a manufacturer ("MGI") to produce and sell the product. MGI also resold an inventory of the product it had purchased from one of HSNDI's other distributors. Two years later, HSNDI terminated the license. Refusing to heed HSNDI's letter to cease and desist, MGI continued to sell the product. MGI invoked the genuine goods doctrine as its defense. As does Volpone, MGI argued that the goods were genuine "because they were manufactured under a then-valid license, and because the goods

---

**8.** There was also a dispute over Mademoiselle's authority to sell irregulars, goods which did not pass plaintiff's quality control inspections. In the instant case, Plaintiff does not allege that the Nolan Ryan products sold by Volpone were of inferior quality. Nevertheless, the Court in *Liz Claiborne* did not distinguish between irregulars and overruns because it held that the goods could not be considered genuine regardless of their quality unless the first sale was authorized.

conform[ed] to HSNDI's quality standards." *Id.* at *1.

The court held that the resale of goods purchased by MGI from HSNDI's distributor was protected by the first sale rule. Having determined that the original sale was authorized, a court must then determine whether the goods are genuine. Since there was no allegation that those goods had been altered, they were considered genuine as a matter of law. However, the exhaustion doctrine did not apply to the goods manufactured by MGI pursuant to the license. The court stated that "the 'genuine product' doctrine does not allow MGI to sell this Product, because it applies only to resales when the original sale was authorized by the trademark holder." *Id.* at *2. In other words, MGI did not have the right to sell the goods after the license was terminated simply because it manufactured the goods while the license was still in effect.

For the same reasons, Volpone had no right to sell Nolan Ryan products after its license was terminated regardless of when the goods were manufactured. Plaintiff had not authorized the initial sale or released them into the stream of commerce. As such, neither the first sale rule nor the genuine goods doctrine serves as a proper defense in the case at bar.

Defendant cites several cases in support of its argument that the unauthorized sale of genuine goods does not constitute a violation of the Lanham Act. However, each case is governed by the first sale rule, whether the court stated as much or not.

In *Polymer Technology Corp. v. Mimran*, 37 F.3d 74 (2nd Cir.1994), the plaintiff, a manufacturer of contact lens solutions, alleged that the defendant, a distributor of ophthalmic lens care products, infringed its trademark by reselling the solutions, which were intended for professional use only, to wholesalers and retail drug stores. The plaintiff sold its product to its authorized distributors, thereby releasing the product into the stream of commerce, who in turn sold it to the defendant. The defendant then resold the product to the wholesalers and retail stores. Since plaintiff authorized the original sale of the products, the Second Circuit held that the plaintiff could not subsequently complain about their resale unless the goods did not meet the trademark owner's quality control standards. *Id.* at 78. There was no dispute that the initial sale of the goods was authorized. The decision, therefore, focused on whether the goods were genuine. In the present case, for the reasons stated above, the goods sold by Volpone after termination of the license cannot be considered genuine because Plaintiff never consented to the sale of those goods in the first place.

*H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.,* 879 F.2d 1005 (2nd Cir.1989), is inapposite for the same reason. In that case, Siemens, which manufactured dental x-ray equipment, asserted counterclaims against Schein Dental, which sold dental equipment through mail order catalogs, for trademark infringement. Schein Dental purchased equipment manufactured by Siemens from Hayden, one of Siemen's authorized dealers. Schein Dental did not install or service the equipment it sold, thus enabling it to sell the product at a discount and thereby creating considerable competition for Siemen's full service distributors. As a result, Siemens directed its dealers not to sell its equipment to third parties for redistribution and requested that Schein Dental remove its Siemens' products from its catalog. Siemens thereafter terminated Hayden as a dealer after it continued to supply Schein Dental. Undeterred, Schein Dental obtained Siemens' equipment from other dealers and continued to sell the equipment through its catalog.

The Second Circuit rejected Siemens' infringement claim, holding that the equipment sold by Schein Dental was "the identical Siemens product sold by authorized Siemens dealers" and thus that there was

no basis for consumer confusion. *Id.* at 1023. The goods were genuine. However, as in *Polymer,* the case arose out of the *resale* of a trademarked product. Although the Court of Appeals did not address the issue, the exhaustion doctrine was applicable. For that reason, the party bringing the Lanham Act claim in both *Polymer* and *H.L. Hayden* alleged that the goods did not meet their quality standards and thus were not genuine. In the instant case, Ryan does not and need not contend that the products were inferior or altered in some way. Rather he simply maintains that once the license was terminated, continued sales were unauthorized. Unlike in the cases it cites, Volpone cannot defend its actions on the basis of the first sale rule.

Volpone also cites *DEP Corporation v. Interstate Cigar Co., Inc.,* 622 F.2d 621 (2nd Cir.1980). In a footnote, the Court of Appeals questioned whether an action for trademark infringement would lie where the product sold by the alleged infringer was genuine, that is the same as the product sold by the plaintiff. *Id.* at 623. However, the Second Circuit never reached the genuine goods issue because it held that the plaintiff lacked standing to assert a Lanham Act claim. Nevertheless, even if plaintiff had standing, the defendant had purchased the product from European middlemen. Assuming the initial sales had been authorized, defendant's resale of a genuine product would have been protected by the first sale rule. Volpone does not and cannot claim that it purchased the Nolan Ryan products from an authorized vendor and simply resold them.

*Sasson Jeans, Inc. v. Sasson Jeans, L.A., Inc.,* 632 F.Supp. 1525 (S.D.N.Y. 1986) is similarly unavailing. In that case, the court held that the sale of Sasson jeans by an ex-licensee did not constitute trademark infringement, reasoning that the goods were genuine and customer confusion was absent as a matter of fact. The plaintiff argued that the goods could not be considered genuine because they were manufactured and sold after the license was terminated. However, the parties had signed a letter agreement, after the license was terminated, governing how the defendant was to dispose of jeans already on hand and those already on order from overseas suppliers. It was thus disingenuous for the plaintiff to argue that it had not authorized the sale of the remaining inventory. As the court explained, "under the August 15, 1985 agreement, [the defendant] had continuing authority from SJI to affix the Sasson trademarks and sell the jeans under the conditions outlined in the letter agreement. It is the existence of this continuing imprimatur from SJI which renders the goods 'genuine.'" *Id.* at 1529. In the case at bar, Plaintiff did not enter an agreement with Defendant regarding leftover inventory. Accordingly, there was no "continuing imprimatur" from Ryan rendering the goods genuine and authorizing their sale.

■ Post termination agreements notwithstanding, Volpone argues not only that it is entitled to liquidate its inventory, but that it has a duty to do so in order to minimize its damages flowing from Ryan's alleged breach of the license agreement.

In *Bill Blass, Ltd. v. SAZ Corp.,* 751 F.2d 152 (3rd Cir.1984), the defendant continued to sell coats with the Bill Blass trademark after its licenses to manufacture and sell such merchandise had expired. The defendant argued, as does Volpone, that it had the right to liquidate previously manufactured inventory. The license governing women's coats provided for a three month grace period to sell off remaining inventory. However, that date had long since passed. The license governing men's coats did not contain a provision covering left over inventory. The defendant argued that, absent an express provision limiting its authority, it had the right to liquidate pre-existing inventory after the expiration of the license. However, the court opined that "[t]he far more reasonable construction is that the licensee under the Men's License undertook the

risk that if it kept its inventory at too high a level the inventory might not be sold by the expiration date of the license." *Id.* at 155. Notwithstanding that the coats were manufactured in accordance with the plaintiff's specifications, the court held that "[t]he sale of trademarked goods after termination of a license amounts to trademark infringement." *Id.* at 154; *see also, Burberrys (Wholesale) Ltd., v. After Six Inc.,* 122 Misc.2d 561, 471 N.Y.S.2d 235 (N.Y.Sup.Ct.1984).

The license granted to Volpone is also silent as to liquidating left over inventory. However, if a licensee could sell inventory manufactured during the term of the license over an indefinite period after its termination or expiration, the expiration date would have little force or meaning. One can imagine a scenario where a licensee intentionally creates a large surplus and thereby grants to itself a de facto extension of the license. Although Plaintiff does not make such an allegation in the present case, Defendant does not have the right to liquidate its inventory and disregard Plaintiff's objections, simply because the products were manufactured prior to termination.

Defendant inappropriately cites *McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d 917 (Fed.Cir.1995), in support of its argument that it had a duty to minimize its damages, caused by Plaintiff's alleged breach of contract, by selling its remaining inventory of Nolan Ryan products. In *McCoy,* the plaintiff hired Mitsuboshi to manufacture and supply shrimp knives bearing McCoy's trademarks. Mitsuboshi produced 150,000 knives per plaintiff's order, but McCoy refused to accept and pay for the majority of the knives. After attempting unsuccessfully to complete delivery and receive full payment, and after warning McCoy of its intentions, Mitsuboshi resold the knives to mitigate its damages. Having found that McCoy unjustifiably refused to pay for the knives, the court held that Mitsuboshi had an implied license to sell the remaining inventory. The court saw "no

reason why the owner of intellectual property rights deserves to evade application of the ordinary contract remedy of resale for an unjustified refusal to pay." *Id.* at 922. Moreover, relying on Texas law, the court held that a judicial determination that McCoy breached the contract was not a prerequisite to Mitsuboshi's right to resell the rejected knives in order to mitigate damages. *Id.* at 922–923.

*McCoy* is distinguishable both on the facts and the law. In the case at bar, Plaintiff did not refuse to pay for goods it had contracted for with the Defendant. Rather, Defendant has allegedly refused to pay royalties to Plaintiff. Plaintiff and Defendant are not party to a buyer-seller contractual arrangement. Although New York law, like Texas law, provides an aggrieved seller the right to resell wrongfully rejected goods, *see* N.Y. U.C.C. §§ 2–703 and 2–706 (McKinney 2000), Volpone is not an aggrieved seller under the terms of those statutory provisions, nor has it cited an analogous provision that would apply to the situation presented by the instant case.

Even if this particular self-help remedy were appropriate, Defendant's use of that remedy was premature. *McCoy* relies in part on *Platt & Munk Co. v. Republic Graphics, Inc.,* 315 F.2d 847 (2nd Cir. 1963), an analogous Second Circuit decision addressing the same issue in a copyright infringement case. There, as in *McCoy,* the defendant had or intended to resell the copyrighted goods after the plaintiff had refused to accept delivery and pay for them. The Court of Appeals also saw "no reason why the copyrighted character of the goods should preclude these remedies." *Id.* at 855. However, unlike the court in *McCoy,* the Second Circuit qualified its holding and required that the aggrieved seller must first obtain a judicial determination that the buyer wrongfully refused the goods. "[T]he manufacturer ought not be allowed to resort to the normal remedy of self-help with the result of impairing the rights granted by the federal copyright law; to that extent state con-

tract ... law must yield to the federally created right. The District Court thus properly issued an injunction to maintain the status quo until this critical issue could be determined." *Id; see also, Burberrys,* 471 N.Y.S.2d at 237 ("a sale by the defendant could not be considered to be made in good faith and to be commercially reasonable. § 2–706 does not purport to grant a trademark license and a sale under the sanction of that section would be doing exactly that ... Moreover, as the claim is a trademark infringement the defendant cannot be penalized for failure to mitigate its claim.") Although Defendant claims that Plaintiff breached the exclusive contract by licensing Nolan Ryan's name, signature and likeness to third parties, there has as yet been no adjudication of that claim.

Volpone has also ignored other, more applicable principles of contract law. As explained in *S & R Corporation v. Jiffy Lube International, Inc.,* 968 F.2d 371, 376 (3rd Cir.1992):

> when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages. Under no circumstances may the non-breaching party stop performance and continue to take advantage of the contract's benefits.

*See also, Romacorp, Inc. v. TR Acquisition Corp.,* 1993 WL 497969 at 12–13 (S.D.N.Y.1993) (collecting cases). This is exactly what Volpone has done. Defendant contracted for the right, the license, to use Nolan Ryan's name, signature and likeness in exchange for royalties. Alleging a breach by Ryan, Volpone chose to stop paying royalties, which it had the right to do. However, having made that choice, it did not have the right to also continue enjoying the license.

The court reached the same conclusion in *S & R Corporation:*

As Defendants have ceased paying the amounts due under the franchise and lease agreements, they seem to have chosen the first option of considering [Plaintiff's] alleged breach a total breach. Thus, Defendants themselves appear to have terminated their contractual relationship with [Plaintiff]. Although Defendants may prevail on their breach of contract claims, thus excusing them from paying the amounts currently due and perhaps entitling them to further damages, the Court cannot see how this separate cause of action entitles them to continued rights under the franchise agreement. In order to have preserved their right to recover for the alleged breaches and to continue to use the [Plaintiff's] trademark, Defendants should have continued to pay royalties ... Continued use of the trademark under these circumstances amounts to infringement under the Lanham Act. (internal citation omitted).

The fact that Volpone's claim that Ryan breached the agreement preceded Ryan's termination of the license does not constitute a defense to the Lanham Act violation. Rather, it is only relevant to the issue of damages. *See Romacorp.,* 1993 WL 497969 at *14; *see also, S & R Corp.,* 968 F.2d at 377.

For the reasons stated above, Plaintiff has stated a viable Lanham Act claim. Defendant's motion to dismiss the infringement claim for failure to state a cause of action upon which relief can be granted is thus denied.

## IV. MOTION TO DISMISS FOR FAILURE TO JOIN INDISPENSABLE PARTIES

Having denied Defendant's motion to dismiss the Lanham Act claim, I revisit Volpone's motion to dismiss for failure to join indispensable parties. *See* discussion *supra* Part II.B. As recently explained by the Second Circuit Court of Appeals in *Viacom International, Inc. v. Kearney,* 212 F.3d 721, 724–25 (2nd Cir.2000):

Fed.R.Civ.P. 19 sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party. First, the court must determine whether an absent party belongs in the suit, i.e., whether the party qualifies as a 'necessary party' party under Rule 19(a) ... If a party does not qualify as necessary under Rule 19(a), then the court need not decide whether its absence warrants dismissal under Rule 19(b) ... But where the court makes a threshold determination that a party is necessary under Rule 19(a), and joinder of the absent party is not feasible for jurisdictional or other reasons ... the court must finally determine whether the party is 'indispensable.' If the court determines that a party is indispensable, then the court must dismiss the action pursuant to Rule 19(b).

(internal citations omitted).

Rule 19(a) provides in pertinent part:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Volpone argues that both Mattgo and Merola are necessary under Rule 19(a) because they are parties to the three licensing agreements around which this dispute centers. Accordingly, Defendant concludes it is unable to get complete relief if Mattgo and Merola are not joined, that Mattgo and Merola's interests might be prejudiced by a finding in favor of Volpone, and that Defendant will be subject to a risk of multiple or inconsistent obligations should Mattgo and Merola assert the same claims as Plaintiff in a future lawsuit. It is well-established that a party to a contract which is the subject of the litigation is considered a necessary party. *See, e.g., Global Discount Travel Services, LLC v. Trans World Airlines, Inc.,* 960 F.Supp. 701, 707–708 (S.D.N.Y.1997) ("As a direct party to the contract which is under dispute, Karabu is a necessary party to this litigation for at least three reasons articulated under Fed.R.Civ.P. 19(a)."); *Kawahara Enterprises, Inc. v. Mitsubishi Electric Corp.,* 1997 WL 589011, 1997 U.S. Dist. Lexis 14282 (S.D.N.Y.1997) (holding that parties to contract were necessary parties to breach of contract action); *Ragan Henry Broadcast Group, Inc. v. Hughes,* 1992 WL 151308 (E.D.Pa.1992) ("Generally, where rights sued upon arise from a contract, all parties thereto must be joined."); *Travelers Indem. Co. v. Household Intern., Inc.,* 775 F.Supp. 518, 527 (D.Conn.1991) ("The court's research has failed to find any case on similar facts that has held that a party to a contract is not an indispensable party. In fact, precedent supports the proposition that a contracting party is the paradigm of an indispensable party.").

Plaintiff does not dispute the contention that parties to a contract are necessary parties under Rule 19(a). Rather, Ryan opposes Volpone's motion on the basis that neither Mattgo nor Merola are parties to the licensing agreements, but merely Ryan's agents. If Plaintiff is correct, neither Mattgo nor Merola would have any obligations or rights under the agreements and thus no legally protected interest in this litigation. Therefore, whether Mattgo and/or Merola are necessary parties under Rule 19(a) turns on whether they are parties to the contracts at issue.

■ I consider Merola's status first. The Master Agreement is signed by Bernie Neumark as CEO of Volpone, Nolan

Ryan in his individual capacity, and Matt Merola for Mattgo Company, Inc. Where a defendant has executed a document in his corporate capacity, he cannot be held personally liable. *See, e.g., Namrod Construction Co., Inc. v. F.V.B. Contracting Corp.,* 116 A.D.2d 556, 497 N.Y.S.2d 411 (2nd Dept.1986); *Gold v. Royal Cigar Co., Inc.,* 105 A.D.2d 831, 482 N.Y.S.2d 32, 33 (2nd Dept.1984). Therefore, Merola, who clearly signed the Master Agreement only as a representative of Mattgo, is not a party to that contract.[9] Moreover, Merola is not mentioned anywhere in the text of the agreement.

■ The Train Set Agreement and Teddy Bear Agreement are signed in the same manner as one another. As in the Master Agreement, Bernie Neumark signed as CEO of Volpone and Nolan Ryan signed in his individual capacity. However, Merola simply signed Matt Merola without making reference to Mattgo. Nevertheless, "under New York common law principles of agency, which govern this contract, a contract which demonstrates on its face that the defendant was acting solely in a representative capacity will not be rendered ambiguous simply because the defendant failed to sign the contract in a representative capacity." *Stroll v. Epstein,* 818 F.Supp. 640, 644 (S.D.N.Y.1993); *see also, Leonard Holzer Associates, Inc. v. Orta,* 250 A.D.2d 737, 672 N.Y.S.2d 915, 916 (2nd Dept.1998) ("The fact that the agent signs the purported agreement in his own name is of no moment where the party alleging personal liability on the agent's part was aware that the agent was, in fact, acting as the agent for a disclosed principal.").

There is no doubt that Volpone knew that Merola was the president of Mattgo. As in the Master Agreement, there is also no mention of Merola in either the Train Set or Teddy Bear Agreements. Furthermore, "[t]he knowledge of a third person obtained in a former transaction with an agent that he or she was acting as an agent for a disclosed principal is deemed to continue in a subsequent transaction of the same character between the same parties." 2A N.Y. Jur.2d Agency and Independent Contractors § 322 (1999). The Train Set and Teddy Bear Agreements were identical in nature to the Master Agreement,[10] in which Merola was clearly acting only as a representative of Mattgo, a corporation which must necessarily act through its agents. Defendant has simply offered no evidence to suggest that Merola intended to bind himself personally or that any of the parties to the contract had reason to construe his intentions as such.

■ Whether Mattgo is a party to the licensing agreements is more problematical.[11] It appears beyond dispute that Volpone knew that Mattgo was serving as Nolan Ryan's agent. Generally, "where

---

9. Defendant can hardly dispute this interpretation. Bernie Neumark signed the Master Agreement, as well as the Teddy Bear and Train Set Agreements, "Bernie Neumark, CEO [of Volpone]." If Merola were a party to the contract in his individual capacity by signing "Matt Merola, Mattgo Company Inc.," then Neumark must also be held personally liable. Tellingly, Volpone did not join Neumark as a party plaintiff in the pending state action nor does Defendant refer to Neumark's position vis-a-vis the contracts in its arguments, indicating that Defendant does not consider Neumark a necessary party, let alone a party to the contract. I do not mean to suggest that Neumark is either a party to the contract or a necessary party, but raise Neumark's status simply to point out that Defendant cannot have it both ways.

10. In fact, it is unclear on the present record whether the Train Set and Teddy Bear Agreements were intended as addendums to the Master Agreement or whether they were intended to stand alone as three completely separate contracts. Either way, the contracts are of sufficiently similar character to impute Volpone's knowledge of Merola's representative capacity in the first transaction to the subsequent transactions.

11. Although technically Mattgo only signed the Master Agreement, given my findings that Merola was acting as agent for the corporation when he signed the Teddy Bear and Train Set Agreements, Mattgo has, in effect, signed all three agreements.

there is a disclosed principal-agent relationship and the contract relates to a matter of the agency, the agent will not be personally bound unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for or to that of his principal." *City of New York v. Aetna Casualty and Surety Co.*, 1997 WL 379704 (S.D.N.Y.1997). However, an "agent may pledge his or her individual responsibility ... by engaging expressly in his or her own name to perform an obligation ... although he or she was known to be an agent and did not intend to bind himself or herself." 2A N.Y. Jur.2d Agency and Independent Contractors § 320 (1999).

Plaintiff maintains that all of the rights and obligations created by the agreements are between Ryan and Volpone. I am not convinced. Concededly the mere fact that Mattgo signed the agreements without making reference to its role as Ryan's agent without more is insufficient to create liability on the part of Mattgo. *See* discussion re Merola *supra.* However, Mattgo signed the agreements in addition to Ryan himself. Generally, a dispute arises over an agent's liability where the agent claims he has signed for the principal and the other party attacks that assertion. Here, the principal, Ryan, signed his own name. Thus, if Mattgo signed merely as agent for Ryan, and by its signature intended to bind only its principal, Mattgo's signature is redundant and seemingly unnecessary. The more reasonable interpretation is that Mattgo superadded its personal liability to that of the principal.

This conclusion finds support in the text of the Master Agreement. Unlike Merola, Mattgo appears in the text of the agreement. The Master Agreement states that "SSCA (licensor) will· have the right to sub-license from Mattgo Company, Inc. *and* Nolan Ryan (licensee) the Nolan Ryan products listed above...." (Defendant Notice of Motion, Exh. A, ¶ 2) (emphasis added).[12] The text is unclear whether the term "licensee" is intended to refer to only Nolan Ryan or both Ryan and Mattgo. The difference is significant because the term "licensee" is used throughout the Master Agreement both granting several rights to and creating several obligations on the part of whomever may be included in that term. After the term "licensee" is defined, Nolan Ryan is referred to by name only once where Ryan guarantees to personally sign several items for Volpone. (Defendant Notice of Motion, Exh. A, ¶ 5). Of course only Ryan himself could assume that obligation; Mattgo cannot autograph items for Ryan. But if "licensee" only referred to Ryan, presumably that term would have been used in that section as well.

Mattgo is mentioned in several other sections of the agreement. For example: "Mattgo Company, Inc. and/or Nolan Ryan shall not license any company ... for any of the products ... without prior written approval from licensor." (Defendant Notice of Motion, Exh. A, ¶ 12); "It is understood that Mattgo Company, Inc. and/or Nolan Ryan have personal endorsement contracts with various consumer goods companies. Should any of these companies wish to use any of the products covered by this license ... SSCA must be given the right of first refusal to produce the products...." (Defendant Notice of Motion, Exh. A, ¶ 13). If "licensee" refers

---

12. SSCA stands for Sport Stamps Collectors Association. Defendant Volpone does business as SSCA. In addition, the terms "licensor" and "licensee" as defined in the Master Agreement reverse the way those terms are generally employed. Ryan, who is licensing to Volpone the right to use his name, signature and likeness, is typically referred to as the licensor. The party who is granted that right is the licensee. The fact that the licensee may have, as Volpone does, the right to sub-license the products to third parties, making the licensee a sub-licensor vis-a-vis the third party sub-licensees, does not change the fact that Volpone is a licensee vis-a-vis Ryan, the original licensor. Nevertheless, to avoid confusion I will employ the terms as defined in the Master Agreement, i.e. Volpone is the licensor and Ryan (and Mattgo) the licensee, for the purposes of this part of the opinion.

to both Ryan and Mattgo, it is curious why the language would suddenly shift from using "licensee" to the more cumbersome "Mattgo Company, Inc. and/or Nolan Ryan." Thus it is not clear that "licensee" does refer to Mattgo as well as Ryan, but it is no more clear that "licensee" only refers to Ryan for the reasons already mentioned.

Nevertheless, even if Mattgo is not included in the term "licensee", Mattgo itself is directly granted at least one right under the agreement: "SSCA will not enter into any agreements to produce premium products without the prior permission of Mattgo Company, Inc." (Defendant Notice of Motion, Exh. A, ¶ 14). Finally, directly above the signature lines, the text characterizes the Master Agreement as an "agreement between SSCA and Nolan Ryan/Mattgo Company, Inc." (Defendant Notice of Motion, Exh. A). While Ryan and Mattgo may seem interchangeable here as a result of the use of the slash mark, thus indicating that Mattgo is merely Ryan's agent, it is equally plausible to interpret the text as defining both Ryan and Mattgo as parties to the agreement, especially when read in the context of the rest of the Master Agreement.

"Absent proof of a contrary intention, an agent should not be held liable where the principal is not only mentioned in the writing but appears to be the only party to whom the writing is addressed." *I. Kaszirer Diamonds, Ltd. v. Zohar Creations, Ltd.*, 146 A.D.2d 492, 536 N.Y.S.2d 449 (1st Dept.1989). In the case at bar there is proof of a contrary intention and the writing is addressed not only to Ryan, the principal, but Mattgo, the agent, as well.

Moreover, although payment was stopped, the postdated royalty checks tendered by Volpone pursuant to the Master Agreement and the Teddy Bear Agreement were to be paid to the order of Mattgo, not Ryan. (Complaint, Exhs. A and C). Whether an agent is personally liable is generally a question of fact. *See* 2A N.Y. Jur.2d Agency and Independent Contractors § 320 (1999). Although this may be a case where poor drafting has disguised the parties' true intentions and Plaintiff may ultimately prove that Mattgo is not a party to the licensing agreements, on the present record a reasonable jury could find that Mattgo did obligate itself in addition to Ryan.[13] Therefore, in order to protect Mattgo's interest and to avoid subjecting Volpone to multiple or inconsistent obligations, I hold that Mattgo is a necessary party under Rule 19(a).

 Joinder of Mattgo would destroy diversity. However, as previously explained, since this court has original jurisdiction pursuant to 28 U.S.C. § 1338 over the Lanham Act claim and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiff's related claims, I need not rely on diversity of citizenship among the parties, which presently exists, to maintain this court's jurisdiction. *See* discussion *supra* Part II.B. Therefore, joinder of Mattgo will not deprive the court of jurisdiction over the subject matter of the action. Since Rule 19(b) by its very terms only applies "[i]f a person as described in subdivision (a)(1)-(2) hereof cannot be made a party," Fed.R.Civ.P. 19(b), I need not determine whether Mattgo is an indispensable party.

**13.** Mattgo is not mentioned in the Train Set or Teddy Bear Agreements. Nevertheless, as with the Master Agreement, Mattgo signed both of these agreements, through Merola, even though Ryan had signed the agreements himself. In addition, at least one of the royalty checks tendered pursuant to the Teddy Bear Agreement was paid to the order of Mattgo, not Ryan. Finally, it is unclear whether these subsequent agreements were merely addendums to the Master Agreement or intended as completely separate agreements. *See* discussion *supra* note 10. The language is so truncated that it is hard to imagine reading the Train Set and Teddy Bear Agreements without the context of the Master Agreement. For these reasons, and given the likelihood that the parties would have been consistent in these related transactions, if Mattgo was a party to the Master Agreement, it was also most likely a party to the Train Set and Teddy Bear Agreements.

For the foregoing reasons, Matt Merola is not a necessary party to this litigation under Rule 19(a) and need not be joined. Mattgo Enterprises, Inc. is a necessary party and must be joined.[14] The motion to dismiss for failure to join an indispensable party is denied.

## V. NEW YORK CIVIL RIGHTS LAW CLAIM

Defendant has also moved to dismiss Plaintiff's second and eighth causes of action for failure to state a claim upon which relief can be granted.

### A. Second Claim For Relief

In his second cause of action, Ryan alleges violations of N.Y. Civil Rights Law §§ 50 and 51. § 50 creates a statutory right of privacy making it a misdemeanor for "[a] person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person." N.Y. Civil Rights Law § 50 (McKinney 2000). § 51 affords the right to bring an equitable action to "[a]ny person whose name, portrait, picture or voice is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained." N.Y. Civil Rights Law § 51 (McKinney 2000). A plaintiff asserting an action pursuant to this statute may be awarded injunctive relief, compensatory damages and, if the defendant knowingly violated the right of privacy, exemplary damages. *Id.*

There is no dispute that Volpone used Ryan's name within New York State for advertising or trade purposes. However, Defendant maintains that Ryan consented to such use by entering into the licensing agreements. Volpone also argues that Ryan's alleged injury is not to his privacy,

but rather to his purse. Defendant is correct that Ryan's right to privacy, as that concept is generally understood, has not been violated. Plaintiff actively sought to exploit the commercial use of his own name, signature and likeness which has substantial value as a result of his accomplishments on the baseball field. Defendant is also correct that New York has not created a statutory right of publicity nor does it recognize a common law right of publicity, in contrast to numerous other states. *See Stephano v. News Group Publications, Inc.*, 64 N.Y.2d 174, 485 N.Y.S.2d 220, 224, 474 N.E.2d 580 (1984).

Nevertheless, although New York's statutory right of privacy originated as a means to protect private individuals from unwanted publicity, the New York Court of Appeals has held that the statute is not limited to such situations. "By its terms the statute applies to any use of a person's picture or portrait for advertising or trade purposes whenever the defendant has not obtained the person's written consent to do so. It would therefore apply, and recently has been held to apply, in cases where the plaintiff generally seeks publicity, or uses his name, portrait or picture, for commercial purposes but has not given written consent for a particular use." *Id.* Thus, the reason New York does not recognize a separate right of publicity is not because it has deemed such interest unworthy of legal protection, but rather because the right of publicity is already subsumed in the statutory right of privacy. *See Id.* ("'right of publicity' is encompassed under the Civil Rights Law as an aspect of the right of privacy"); *see also, Allen*, 610 F.Supp. at 621 ("'right of publicity' was merely a misnomer for the privacy interest protected by the Civil Rights Law, as applied to public figures"). Accordingly, the right of privacy is applicable

---

**14.** In the licensing agreements, Mattgo's full corporate name is Mattgo Company Inc. However, in the complaint in this action and in the caption of the complaint in the pending state action in which Mattgo is already a party, Mattgo's full corporate name is Mattgo Enterprises, Inc. The parties should ascertain which is the correct name and join the appropriate party.

here if Ryan's name was used without his consent.

Defendant cites *Wrangell v. C.F. Hathaway Co.*, 22 A.D.2d 649, 253 N.Y.S.2d 41 (1st Dept.1964), for the proposition that once consent to the use of one's name or photograph has been granted, the right of privacy is relinquished and subsequent disputes over the scope of the consent are merely matters of contract. In *Wrangell*, plaintiff had consented to the use of his photograph in the connection with the advertisement of men's shirts. When defendant began using the photo to advertise women's shirts as well, plaintiff sued, arguing that such use extended beyond the consent given. The court dismissed the cause of action, holding that "it is apparent that plaintiff's grievance is not the breach of his right to privacy, which he does not particularly seek, but the alleged unauthorized use of his photograph in a special way without extra compensation therefor. By his contract of employment and his consent to defendant's use of his photograph in its trademark, plaintiff relinquished his right to privacy." Id. at 42–43.

Although *Wrangell* does support Volpone's argument, it appears that the reasoning adopted by the court in that case is no longer valid.[15] *Wrangell* predated by twenty years the New York Court of Appeals holding in *Stephano* that the statutory right of privacy protects not only privacy, but an individual's so-called right of publicity as well. Therefore, the mere fact that the plaintiff in *Wrangell* was not concerned with an invasion of privacy should not have been fatal to the cause of action. If Wrangell could prove that his consent was limited to using the photo for the

advertisement of men's shirts, it would seem that he had stated a cause of action under N.Y. Civil Rights Law § 51.

Ryan alleges that he terminated the licensing agreements and thereby revoked his consent to the continued use by Volpone of his name, likeness and signature. Plaintiff notified Defendant of the termination and demanded that it cease and desist from any further use of his name. Volpone allegedly ignored these warnings. Seemingly in direct contrast to the holding in *Wrangell*, the New York Court of Appeals has held:

> [W]here the written consent to use the plaintiff's name or picture for advertising or trade purposes has expired or the defendant has otherwise exceeded the limitations of the consent, the plaintiff may seek damages or other relief under the statute, even though he might properly sue for breach of contract. The right which the statute permits the plaintiff to vindicate in such a case may, perhaps, more accurately be described as a right of publicity.

*Stephano*, 485 N.Y.S.2d at 224, 474 N.E.2d 580 (internal citations omitted). Viewing the allegations in the light most favorable to the Plaintiff, it would appear that Volpone used Ryan's name for commercial purposes without his consent in violation of New York's Civil Rights law. Additional case law supports Ryan's position.

In *Nutrivida, Inc. v. Inmuno Vital, Inc.*, 1997 WL 1106569 (S.D.Fla.1997), the parties had entered an agreement whereby Nutrivida would distribute a vitamin supplement product supplied by Immuno. In connection with advertising the product,

---

**15.** The other cases cited by Defendant in support of its motion to dismiss are completely inapplicable. Both *Yameta Co. v. Capitol Records, Inc.*, 279 F.Supp. 582 (S.D.N.Y.1968) and *Flack v. United Artists Corp.*, 378 F.Supp. 637 (S.D.N.Y.1974), which denied motions for preliminary injunctions, relied on a provision of § 51 which does not apply to the case at bar. § 51 states in pertinent part that "nothing contained in this article shall be so construed as to prevent any person, firm or corporation ... from using the name, portrait, picture or voice of any author, composer or artist in connection with his literary, musical or artistic productions which he has sold or disposed of with such name, portrait, picture or voice used in connection therewith." N.Y. Civil Rights Law § 51. Since Ryan is neither an author, composer nor artist, this exception to the written consent requirement does not advance Defendant's argument.

Nutrivida began to use the name of a Mexican actor, Andres Garcia Garcia, whose cancer was cured using the vitamin supplement. Garcia had consented expressly to Immuno's use of his name, but not Nutrivida. Subsequently, a dispute arose and Nutrivida and Immuno terminated the distribution agreement. Nevertheless, Nutrivida continued to run the Garcia advertisements.

In the suit that followed, Immuno as exclusive licensee of the use of Garcia's name counterclaimed for a violation of its right of publicity under N.Y. Civil Rights Law §§ 50 and 51. Although there was a question whether Nutrivida ever had consent to use Garcia's name by virtue of its agreement with Immuno, a question left to the jury, the court held that any such consent expired when the agreement was terminated. Thus, it concluded that "Nutrivida is liable as a matter of law because the consent to use Garcia's name, if there was any, expired after Garcia's counsel sent Nutrivida a cease and desist letter." *Nutrivida,* 1997 WL 1106569 at 6. In the case at bar, Ryan sent a termination notice and a cease and desist letter which Defendant disregarded. While Volpone may contest the validity of the termination, Ryan has certainly stated a viable cause of action.

A similar conclusion was reached in *Welch v. Mr. Christmas Inc.,* 57 N.Y.2d 143, 454 N.Y.S.2d 971, 440 N.E.2d 1317 (1982). There the plaintiff agreed to appear in a television commercial which would run for only a limited time. However, Defendant continued to air the commercial even after the contractual time period had expired. Defendant argued that in light of plaintiff's written consent, Welch could only seek relief for breach of contract. Unpersuaded, the court held that "Plaintiff's statutory action is not foreclosed by the previously effective but now expired consent." *Id.* at 974, 440 N.E.2d 1317. As a result, Volpone's defense must amount to more than showing that Ryan had previously consented to the use of his name. That is not in dispute. Whether Ryan's consent remained in effect after the alleged termination is.

For the reasons stated above Ryan has stated a viable claim under New York's Civil Rights law. Accordingly, the motion to dismiss Plaintiff's second cause of action for failure to state a claim is denied.

### B. *Eighth Claim For Relief*

In his eighth cause of action, Ryan alleges that Defendant "threatens to impair and dilute the value of plaintiff's celebrity, persona and image." (Complaint ¶ 60). Consequently, he seeks injunctive relief barring Defendant from continuing to exploit his name, signature and likeness without his consent. Volpone argues that this is an attempt to assert a common law right of publicity. Ryan responds that the "eighth cause of action is simply a claim for injunctive relief under common law, statutory and equitable principles." (Plaintiff's Reply Memorandum in Further Support of Motion for Preliminary Injunction). Plaintiff does not elaborate on the applicable common law that supposedly affords him the requested relief.

■■■ As previously discussed, *see* discussion *supra* Part V.A., New York does not recognize a common law right of publicity. However, injunctive relief is an available remedy under N.Y. Civil Rights Law § 51. Since Plaintiff did not make an express prayer for injunctive relief as part of his second cause of action, the Eighth count of the complaint is not redundant so as to require dismissal. Nevertheless, to the extent the claim is made pursuant to common law, the cause of action is dismissed. Plaintiff's basis for injunctive relief arises out of Defendant's alleged violations of the Lanham Act and/or New York's Civil Right's law or not at all.

## VI. *ABSTENTION*

Defendant has moved in the alternative to dismiss the current action in its entirety in deference to the concurrent state proceeding. Two of Volpone's strongest argu-

ments in favor of abstention were that state law would control, there being no viable Lanham Act claim, and that failure to abstain would necessarily result in piecemeal litigation as certain parties to the state action, namely Mattgo and Merola, were indispensable parties to the federal action. It was necessary, therefore, to consider first whether Plaintiff had stated a claim under the Lanham Act and whether Mattgo and/or Merola were indispensable parties under Fed.R.Civ.P. 19. As a threshold matter it was also necessary to determine whether this court had subject matter jurisdiction over this action, for if it did not there would be no action from which to abstain. Having addressed all of those issues, I am now in a position to turn to the merits of Defendant's motion to dismiss in deference to the pending state action.

"Generally, as between state and federal courts, the rule is that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). This is especially the case given "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Id.* Nevertheless, the Supreme Court has held that a federal court may dismiss a federal suit in favor of a concurrent state action "for reasons of wise judicial administration" in "exceptional" circumstances. *Id.*

 Six factors guide a district court's decision whether to abstain from exercising its jurisdiction. *Village of Westfield v. Welch's,* 170 F.3d 116, 121 (2nd Cir.1999). As recently recited by the Court of Appeals, these six factors include:

(1) the assumption of jurisdiction by either court over any res or property;

(2) the inconvenience of the federal forum;

(3) the avoidance of piecemeal litigation;

(4) the order in which jurisdiction was obtained;

(5) whether state or federal law supplies the rule of decision; and

(6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction.

*Id.* When weighing these factors the Supreme Court has counseled that "the decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, *with the balance heavily weighted in favor of the exercise of jurisdiction."* Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 16, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (emphasis added); *see also, Colorado River,* 424 U.S. at 819, 96 S.Ct. 1236 ("only the clearest of justifications will warrant dismissal").

 With regards to the first two factors, the parties agree that there is no res or property involved over which either court would assume jurisdiction, and the federal and state courts are equally convenient, or inconvenient depending on how one looks at it, being as they are located across the street from one another. Defendant concludes, therefore, that these factors are neutral and do not shift the balance towards either the federal or state forum. However, exercise of federal jurisdiction is the preferred position. *See Colorado River,* 424 U.S. at 813, 96 S.Ct. 1236. Thus, although a court's application of the six factors is case specific and the weight accorded any given factor may vary depending on the circumstances, *see Moses H. Cone Mem'l Hosp.,* 460 U.S. at 16, 103 S.Ct. 927, entitling these two factor to relatively minor consideration, "the absence of a res points toward exercise of federal jurisdiction," and similarly "where the federal court is just as convenient as the state court, that factor favors retention of the case in federal court." *Village of*

*Westfield,* 170 F.3d at 122 (internal quotations and citations omitted).

Defendant maintains that abstention is required in order to avoid piecemeal litigation. The basis for this contention is that Mattgo and Merola are indispensable parties which cannot be joined in the federal action. Consequently, Volpone states, the only way Defendant can secure a ruling binding on Mattgo and Merola is to proceed in the state court. As a result of my ruling with respect to Mattgo and Merola, *see* discussion *supra* Part IV, the wind has, in effect, been taken out of the sails of Defendant's argument. Merola acted merely in a corporate capacity for Mattgo. Mattgo can and shall be joined in the federal suit. Accordingly, Volpone can obtain complete relief just as readily in this court as in the state court. Again, although this apparently renders this factor neutral, the exercise of federal jurisdiction remains the rule, not the exception. *See Colorado River,* 424 U.S. at 813, 96 S.Ct. 1236.

When considering the order in which jurisdiction was obtained by each court, "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 21, 103 S.Ct. 927. Although the state action was commenced earlier, the parties agree that this court obtained jurisdiction first.[16] Plaintiff claims that discovery has begun and that Volpone has noticed depositions and served document requests in the federal action. Although Defendant does not dispute that it has attempted to initiate discovery, Volpone claims that Ryan refused to appear for a deposition and has

not yet produced documents in answer to Volpone's requests. Plaintiff does not deny this, but accuses Neumark, president of Volpone, of failing to appear for his deposition as well. Plaintiff has moved for a preliminary injunction and Defendant has moved to dismiss on several theories in addition to abstention in deference to the state suit. The state action, on the other hand, has been stayed pending my decision on the motions addressed in this opinion. Although the federal suit appears to have progressed somewhat more than the state action, which is currently as a standstill, the difference seems far less marked than Plaintiff protests. Nevertheless, "where there has been limited progress in a state court suit," which Defendant here does not deny is the case, "the fact that the state action was commenced before the federal suit carries little weight." *Village of Westfield,* 170 F.3d at 122 (internal quotations and citation omitted).[17]

Having denied Defendant's motions to dismiss the Lanham Act Claim for lack of subject matter jurisdiction and failure to state a claim, Volpone can no longer argue that "the case hinges entirely on state law." (Memorandum of Law in Support of Defendant's Cross–Motion to Dismiss and in Opposition to Plaintiff's Motion for Preliminary Injunction, p. 4). Thus, this action involves questions of both federal and state law. Nevertheless, since a federal court's jurisdiction over Lanham Act claims is concurrent with that of the state courts, *see supra* note 3, this factor does not weigh heavily in favor of the exercise of federal jurisdiction. *See Moses Cone Mem'l Hosp.,* 460 U.S. at 25, 103 S.Ct. 927

16. The parties dispute whether the state court obtained jurisdiction two weeks or two months after the federal court. Since both courts obtained jurisdiction approximately around the same time, the distinction is not crucial.

17. Defendant argues that the Plaintiff has prevented discovery in the state action by moving to stay or dismiss the action. Regardless of

the reason, the fact remains that the state action has not progressed. Even assuming arguendo that the federal action has progressed no further than the state action, which is to say neither action has progressed beyond inception, the lack of progress in the federal action does not tip the scales in favor of abstention where the state action has not advanced either.

(source-of-law factor less significant where federal and state courts had concurrent jurisdiction to enforce the Arbitration Act). At the same time and concurrent jurisdiction notwithstanding, "the presence of federal-law issues must always be a major consideration weighing against surrender." *Id.* at 26, 103 S.Ct. 927.[18]

Defendant also argues that Plaintiff's claims under New York Civil Right's law are unusual and, therefore, best addressed by the state court. However, Volpone makes no effort to explain what makes such claims unusual nor does it cite any case law attesting to the difficulty courts encounter in adjudicating such claims. Contrary to Defendant's assertion, I disagree that claims brought under a statute which was enacted nearly a century ago, *see Allen,* 610 F.Supp. at 620 ("New York legislature passed sections 50 and 51 of the Civil Rights Law in 1903"),[19] present novel or unusual questions of state law, such that this is one of those "rare circumstances" in which "the presence of state-law issues may weigh in favor" of abstention. *Moses Cone Mem'l Hosp.,* 460 U.S. at 26, 103 S.Ct. 927; *see also, Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.,* 800 F.2d 325, 328 (2nd Cir.1986).

Even Ryan, who is the party invoking federal jurisdiction, concedes that the state court proceeding would adequately protect his rights. Nonetheless, the Second Circuit has held that "the possibility that the state court proceeding might adequately protect the interests of the parties is not enough to justify the district court's deference to the state action. This factor, like

choice of law, is more important when it weighs in favor of federal jurisdiction. It is thus of little weight here." *Bethlehem Contracting Co.,* 800 F.2d at 328.

In support of its argument in favor of abstention, Volpone cites *Westwood Inc. v. Cal Togs, Inc.,* 1982 U.S. Dist. Lexis 15455 (S.D.N.Y.1982), which held that the most important factor in its decision to abstain was that the major issues and the parties in both actions are identical, *id.* at 5, "a factor clearly present here." (Memorandum of Law in Support of Defendant's Cross–Motion to Dismiss and in Opposition to Plaintiff's Motion for Preliminary Injunction, p. 5). I do not consider *Westwood* persuasive precedent. First of all, in determining whether to abstain, the court in *Westwood* did not apply the factors as formulated by the Supreme Court in *Colorado River* and *Moses H. Cone Memorial Hospital* as required by the Second Circuit Court of Appeals. *See Village of Westfield,* 170 F.3d at 121–122. Second, the court gave no consideration to the strong preference for exercising federal jurisdiction, which should have been factored into its analysis, especially since the court seemed to conclude that the parties could obtain equivalent relief in both forums. Finally, deeming the identity of issues and parties as the most important factor in its decision is inconsistent with more recent case law. Although the existence of a parallel state action is a necessary prerequisite to this type of abstention, the establishment of such an action alone does not justify abstention. "This argument would

---

**18.** The Supreme Court noted that the Federal Arbitration Act does not create independent federal question jurisdiction and thus requires that federal courts have jurisdiction over the underlying dispute before entering an order compelling arbitration. Nevertheless, the Court considered the Federal Arbitration Act a federal-law issue because it "represents federal policy to be vindicated by the federal courts where otherwise appropriate." *Moses Cone Mem'l Hosp.,* 460 U.S. at 26, n. 32, 103 S.Ct. 927. The Lanham Act, on the other hand, does create an independent basis for federal question jurisdiction pursuant to 28

U.S.C. § 1338. If concurrent state jurisdiction did not weigh in favor of abstention in a case involving the Arbitration Act, the enforcement of which "is left in large part to the state courts," *Moses Cone Mem'l Hosp.,* 460 U.S. at 26, n. 32, 103 S.Ct. 927, it can hardly justify abstention in a trademark case.

**19.** Even the right of publicity, with which this case is more specifically concerned, was recognized as a part of the right of privacy no later than 1982, nearly twenty years ago. *See Welch,* 454 N.Y.S.2d 971, 440 N.E.2d 1317.

eviscerate *Colorado River*, as federal courts consider abstaining under *Colorado River* only in cases where there are concurrent and simultaneous federal and state proceedings. This factor therefore could not justify the district court's stay." *Village of Westfield*, 170 F.3d at 122.

Although most of the factors appear to weigh evenly between the federal and state courts, it is improper for a federal court to abdicate jurisdiction simply because the state court provides an additional adequate forum. The Supreme Court has emphasized that "our task in cases such as this is not to find some substantial reason for the exercise of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under *Colorado River* to justify the surrender of that jurisdiction." *Moses Cone Mem'l Hosp.*, 460 U.S. at 25–26, 103 S.Ct. 927; *see also, Colorado River*, 424 U.S. at 813, 96 S.Ct. 1236 ("The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest."). While the state court may be as equipped as this court to adjudicate the dispute between these parties, there are no special or unique circumstances in the case at bar that justify dismissing this action in deference to the state proceeding. Accordingly, Defendant's motion for this court to abstain from exercising its jurisdiction is denied.

## VII. *PRELIMINARY INJUNCTION*

Having disposed of Defendant's various motions, I now turn to Plaintiff's motion for a preliminary injunction.

Plaintiff moves for a preliminary injunction pursuant to the Lanham Act, 15 U.S.C. § 1116 and § 51 of the New York Civil Rights law. "A preliminary injunction should be granted where the moving party demonstrates (1) irreparable harm and (2) either (a) a probability of success on the merits or (b) sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly in the moving party's favor." *Church of Scientology International v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 41 (2nd Cir.1986).

### A. *Probability of Success on the Merits*

In order to prevail on the Lanham Act claim, Ryan must show a likelihood of consumer confusion as to his sponsorship or approval of the Nolan Ryan products produced and marketed by Defendant. In order to prevail on the New York Civil Rights law claim, Plaintiff need only show that his name was used for commercial purposes without his consent. Both claims depend on Plaintiff's purported termination of the licensing agreements.

■ If the termination was proper, any use of Ryan's name, likeness or signature thereafter was without his consent violating N.Y. Civil Rights law §§ 50 and 51. *See* discussion *supra* Part V.A. Volpone does not directly attack the validity of Plaintiff's termination of the licensing agreements. Rather, Defendant argues that Ryan breached the agreements, specifically by licensing his name to others in violation of the exclusivity provision and by failing to honor his alleged obligation to protect Volpone against third party infringers, thereby justifying Volpone's refusal to continue to pay royalties. As previously explained, *see* discussion *supra* Part III, a party to a contract may respond to the other party's breach in one of two ways: the non-breaching party may stop performance and sue for total breach, or continue to perform and sue for partial breach. What the non-breaching party

cannot do is avoid its obligations under the contract and yet continue to reap the benefits. *S & R Corporation v. Jiffy Lube International, Inc.*, 968 F.2d 371, 376 (3rd Cir.1992); *see also, Romacorp, Inc. v. TR Acquisition Corp.*, 1993 WL 497969 at 12–13 (S.D.N.Y.1993) (collecting cases).

In the case at bar, the Master Agreement provides "[i]n the event of non payment of the minimum guarantee by the due date specified in the agreement, Licensor will have 60 days to cure the default. If the default is not cured after 60 days then the agreement is terminated and all sub-license agreements revert to Mattgo, without further notice." (Defendant Notice of Motion, Exh. A., ¶ 10). It is undisputed that Defendant stopped making royalty payments.[20] As a result Plaintiff sent a notice dated August 10, 1999 terminating the agreement and ordering Volpone to cease and desist from continuing to manufacture, produce, distribute or sell any Nolan Ryan products. Given the 60 day cure period and since the payments were originally due on June 30, 1999, termination on August 10, 1999 might have been premature. Nevertheless, by the time Plaintiff sent the second cease and desist letter dated October 7, 1999, more than sixty days had passed without payment.[21] The Master Agreement is clear that failure to cure nonpayment of royalties within the proscribed time period results in automatic termination of the license.

Volpone does not dispute that it continued to sell Nolan Ryan products through December 31, 1999, the date the agreements would have expired had Plaintiff not terminated them. Defendant also concedes that it continued to post a number of licensed items for sale on certain websites as recently as mid March 2000 and that a number of licensed goods were sold after December 31, 1999.[22] Thus, although Volpone might ultimately prevail on its breach of contract claims, it has, by its own admission, continued to market Nolan Ryan products after Plaintiff terminated the agreement and in spite of two cease and desist letters.[23] Having withdrawn his consent by terminating the licensing agreements, there is a likelihood that Plaintiff will succeed on the merits of his New York Civil Rights law claim.

**20.** Plaintiff also claims that Defendant entered a sub-licensing agreement without consent as required by the Master Agreement (Defendant Notice of Motion, Exh. A., ¶ 2), which extended through December 31, 2001, two years after the license granted to Defendant was set to expire. Volpone claims that Mattgo had given, at the least, its implied consent by forwarding the contract to Defendant. Regardless, according to the terms of the Master Agreement, once the agreement terminated, all sub-licenses, even if initially authorized, should have reverted to Mattgo. (Defendant Notice of Motion, Exh. A., ¶ 10). Presumably this would include another allegedly unauthorized sub-license involving Mini–Wheaties boxes.

**21.** Even if the cure period began to run from the renegotiated payment date as indicated by the checks accepted by *Mattgo* which were postdated July 31, 1999, payment would have been due no later than September 29, 1999. Accordingly, uncertainty about the correct date does not invalidate the termination, although the effective date of termination may be relevant to a determination of damages.

**22.** Volpone attributes the posting of the licensed goods to clerical error and the sale of a "de minimis" number of licensed items to their accidental inclusion in "drop ship" orders.

**23.** Although Volpone admits the sale of licensed items after the purported termination of the agreement, Defendant attempts to draw a distinction between those items and items that Ryan personally signed. Defendant argues that Ryan agreed to autograph an unlimited number of cards, baseballs, etc., pursuant to a separate and distinct arrangement, not a license. Therefore, the sale of those items should not be restricted. Although Ryan was compensated for such autographs by a flat fee rather than a royalty, the promise to personally sign items upon Volpone's request was clearly a part of the Master Agreement. Moreover, Ryan could certainly grant to others a right to autographed items just the same as he could grant the right to use his name, likeness or facsimile signature. Accordingly, I fail to appreciate the distinction drawn by Defendant.

There being two bases for granting a preliminary injunction, New York Civil Rights law and the Lanham Act and having shown a probability of success on the merits of the former, Plaintiff need not show a probability of success on the latter to merit injunctive relief. Nevertheless, there is a probability of success on the merits of the Lanham Act claim, or at least sufficiently serious questions going to the merits to make them fair grounds for litigation. Due to Plaintiff's termination of the licensing agreements, Volpone's continued use of Ryan's name, likeness and signature was without authorization. However, to prevail on the Lanham Act claim, Plaintiff must also demonstrate a likelihood of confusion.

"In the licensing framework, where the alleged unauthorized user of the trademark continues to use the identical, previously licensed trademark, after revocation of the license, likelihood of confusion is established." *Southland Corp. v. Froelich*, 41 F.Supp.2d 227, 243 (E.D.N.Y.1999) (collecting cases); *see also, Murjani International, Ltd. v. Sun Apparel, Inc.*, 1987 WL 15110 (S.D.N.Y.1987) (" 'Common sense compels the conclusion that a strong risk of consumer confusion arises where a terminated [licensee] continues to use the former [licensor's] trademarks' " quoting *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir.1983)). Generally, a court assesses the likelihood of confusion by comparing the plaintiff's mark with that of the defendant. However, in the case of an ex-licensee, the marks are identical and confusion is almost inevitable. *See Church of Scientology International v. Elmira Mission of Church of Scientology*, 794 F.2d 38 (2nd Cir.1986). As thoroughly discussed in the section denying Defendant's motion to dismiss the Lanham Act claim for failure to state a cause of action, *see* discussion *supra* Part III, "[t]he public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Dallas Cowboys Cheerleaders, Inc. v. Pus-*sycat Cinema, Ltd., 604 F.2d 200, 205 (2nd Cir.1979).

In the case at bar, Defendant continued to use Plaintiff's mark without authorization after its license was terminated. Given the nature of the products at issue, it is not only plausible, but probable that consumers will assume that Nolan Ryan is associated with and/or approves of the merchandise which bears his name, likeness and signature. In effect, the person and the mark are inseparable in this context. But if this were somehow not enough to establish the requisite likelihood of confusion, the advertising campaign employed by Volpone to sell these products via the internet certainly is.

Not surprisingly, with the growing reliance on and use of "e-commerce", one avenue by which Volpone marketed, distributed and sold Nolan Ryan products was the internet. On a number of the websites offering Nolan Ryan merchandise, a description of the product was accompanied by phrases claiming that the products were authorized by the Plaintiff. For example, "Each spectacular 23–karat GOLD card honors one of Nolan Ryan's greatest achievements—*and is personally authorized by Ryan himself*" (emphasis added); "Nolan Ryan's authorized signature appears on each 23K gold card!"; the Nolan Ryan Train Set is advertised as being "Personally authorized by Nolan Ryan"; Nolan Ryan Signature Baseball "Personally authorized by Nolan Ryan" and featuring "Ryan's authorized facsimile"; the Nolan Ryan 5714 Victories 23–Karat Gold Card, 7 No–Hitters Gold Card, "34" Gold Card, and Express to Cooperstown Gold Card all "Feature[ ] Ryan's authorized signature"; Nolan Ryan "Flash" Bears are described as a "Licensed, limited edition product" and "All personality specific Bears are licensed by the athlete and feature things that relate expressly to the individual."

With representations such as these, the consumer cannot help but conclude that Nolan Ryan sponsors and has authorized

these products himself. Volpone sought to take advantage of that tendency to associate such products with the athlete they celebrate by making it explicit. It seems apparent that the representations are intended to make the product more desirable. The consumer who purchases these products may very well do so, at least in part, because they are allegedly officially authorized and licensed by Plaintiff. His stamp of approval adds value in the mind of the consumer. However, once the license was terminated, Ryan withdrew that approval. Defendant's advertisements thus are likely to confuse potential purchasers. Volpone's contention that Ryan's initial authorization and license render these goods genuine is incorrect for the reasons already discussed. *See* discussion *supra* Part III.[24]

■ The likelihood of confusion analysis is generally guided by the eight factors originally set forth by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2nd Cir.1961) and recently applied in *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43 (2nd Cir. 2000). These factors include:

(i) the strength of plaintiff's mark;

(ii) the similarity of the parties' marks;

(iii) the proximity of the parties' products in the marketplace;

(iv) the likelihood that the plaintiff will bridge the gap between the products;

(v) actual confusion;

(vi) the defendant's intent in adopting its mark;

(vii) the quality of the defendant's product; and

(viii) the sophistication of the relevant consumer group.

*Id.* at 45–47. The more similar the marks and the more overlap between the products, the greater the likelihood of confusion. It is evident that the so-called Polaroid factors are more geared towards comparing two distinct, albeit similar, marks. Thus, their application may be unnecessary in the case of an ex-licensee using a previously licensed mark where only one trademark is involved. *But see, By Design PLC v. Ben Elias Industries Corp.*, 1998 WL 998964 (S.D.N.Y.1998) (applying Polaroid factors even though Defendant was using Plaintiff's exact mark). Nevertheless, applying the factors to the present case can only drive the point home by further demonstrating that there is a likelihood of confusion.

The Polaroid factors begin with the strength of Plaintiff's mark. Assessing the strength of actor and writer Woody Allen's likeness, the court in *Allen v. National Video, Inc.* stated that "[t]here is no dispute that plaintiff's name and likeness are well-known to the public, and that he has built up a considerable investment in his unique, positive public image. Plaintiff's 'mark', to analogize from trademark law, is a strong one." *Allen*, 610 F.Supp. at 627. This analysis applies equally well to Nolan Ryan, a former Major League Baseball pitching sensation and Hall of Fame inductee.

As to the second factor, since Volpone continued to use Ryan's actual name, likeness and facsimile signature, the marks are not only similar but identical. Therefore, a consumer could not possibly distin-

---

**24.** In addition to the cases already discussed, Defendant also cites *Abelman v. Polinex Plastic Products Canada, Ltd.*, 1992 WL 212471, 1992 U.S. Dist. Lexis 12868 (S.D.N.Y.1992). In *Abelman*, the court denied a motion for a preliminary injunction holding that there was no confusion because the products at issue, Hang All hangers, did not purport to be anything other than what they were. However, the court did not actually discuss the genuine goods doctrine nor did it have occasion to consider confusion with regards to sponsorship, the crux of the case at bar. In addition *Abelman* did not involve sales by an ex-licensee. Rather it involved a dispute over the rights to sell the hangers after the single enterprise formed to design, manufacture and sell the hangers dissolved. Accordingly, it is distinguishable from the case at bar.

guish between a licensed product bearing Ryan's mark and an unlicensed one.

It makes sense to consider the third and fourth factors together. Plaintiff licenses his name, likeness and signature to third parties in connection with Nolan Ryan, baseball souvenirs and memorabilia. As a former licensee, defendant's products are extremely similar, if not identical, to licensed merchandise. Since the parties' products, i.e. licensed and unlicensed Nolan Ryan products bearing his name, likeness and/or signature, occupy the same market and target the same consumers, the products are in competitive proximity and there is no gap to bridge between them.

Although Plaintiff has not yet demonstrated any actual confusion on the part of consumers, this lack of evidence is not fatal to his motion for a preliminary injunction. The Second Circuit has held that "[a]lthough it is necessary to prove that the buying public was actually deceived in order to recover damages under § 43(a) of the Lanham Act, only a likelihood of confusion or deception need be shown in order to obtain equitable relief." *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2nd Cir.1981) (citations omitted); *see also, Allen*, 610 F.Supp. at 628 (noting that although evidence of actual confusion is probative of likelihood of confusion, it is not required). As explained above, there is certainly a likelihood of confusion as to Ryan's authorization and sponsorship of the goods in question.

The sixth factor considers Defendant's motives in using Plaintiff's marks. As previously discussed, Defendant continued to advertise its products as authorized and licensed by Nolan Ryan himself even after the license was terminated and Plaintiff had served two cease and desist letters. Plaintiff did not include any disclaimers regarding the lack of Plaintiff's continued sponsorship. On the contrary, the representation that Ryan authorized and licensed these products was clearly intended to enhance sales. Once again the analysis

in *Allen* is apposite to the case at bar. "[D]efendants admit that they designed the advertisement intentionally to evoke an association with plaintiff. They must therefore at least have been aware of the risk of consumer confusion, which militates against a finding that their motives were completely innocent. Defendants may not have intended to imply that plaintiff actually endorsed their product, but they happily risked creating that impression in an attempt to gain commercial advantage through reference to plaintiff's public image." *Allen*, 610 F.Supp. at 628.

The quality of defendant's products has never been at issue. Plaintiff does not suggest that the quality of defendant's products is inferior and that Ryan's reputation will suffer as a result of being associated with such products. Nor does he contend that the quality of defendant's product will somehow contribute to consumer confusion. Accordingly, this factor alone weighs in favor of the Defendant.

The final factor, the sophistication of the relevant consumer group, strongly favors Plaintiff. Consumers of these products likely range from the avid sports memorabilia collector to the average Nolan Ryan fan to children, especially given that the prices at which these products sell range anywhere from hundreds of dollars to twenty dollars. Thus, there is potential for confusion at the very least among the more unsophisticated members of the relevant consumer pool. However, given that Defendant is using Plaintiff's identical mark and in light of Defendant's representations concerning authorization and licensing, even the more sophisticated consumers will necessarily be confused.

"[T]he evaluation of the Polaroid factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Nabisco*, 220 F.3d 46–47. Having considered the Polaroid factors along with

the discussion that immediately precedes it, however, there is certainly a likelihood of confusion and thus a probability of success on the merits of Plaintiff's Lanham Act claim.

Even assuming arguendo that Plaintiff has failed to establish a probability of success on the merits of either or both the Lanham Act claim and New York Civil Rights law claim, Ryan has, at the very least, demonstrated sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly in the moving party's favor. Volpone argues that the balance of equities favors Defendant because if a preliminary injunction is issued, it will be stuck with hundreds of thousands of dollars of inventory. I have previously discussed Defendant's right, or lack thereof, to sell off remaining inventory. *See* discussion *supra* Part III. Defendant cites several additional cases in which the court considered the non-moving party's interest in liquidating existing inventory in the context of a motion for a preliminary injunction. They are all distinguishable.

In *Abelman v. Polinex Plastics Products Canada, Ltd.*, 1992 WL 212471, 1992 U.S. Dist. Lexis 12868 (S.D.N.Y.1992), the court held that the equities favored the defendant who had an inventory of thousands of hangars. However, the plaintiff in that case owed the defendant approximately $1 million for shipped but unpaid-for merchandise. In the case at bar, it is Defendant who has concededly withheld royalty payments. Furthermore, the plaintiff's alleged competing interest, potential damage to its reputation and goodwill, was not compelling given that the plaintiff was in receivership and had taken steps to dissolve the company. Ryan, on the other hand, continues to license his name, likeness, and signature.

In *B.L.I. Apparel Corp. v. Heritage Quilts, Inc.*, 1980 WL 30219, 1980 U.S. Dist. Lexis 9825 (S.D.N.Y.1980), the court permitted the defendant to liquidate its existing inventory of running shorts. However, the court held that there was no continuing danger of consumer confusion, the defendant was unaware of the conduct complained of by plaintiff which consisted of actions taken by an independent sales representative, and the defendant was closing out the sports apparel division of its business. The sum of these factors, none of which are present in the case at bar, tipped the balance of hardships in defendant's favor.

Similarly, in *Lever Brothers Co. v. Mattel, Inc.*, 609 F.Supp. 1395 (S.D.N.Y.1985), in which the plaintiff sought to enjoin the sale of a plush toy called "Snuggles the Seal" as infringing on the teddy bear named "Snuggle" famous as the "spokesbear" for Snuggle fabric softener, the court denied the injunction because it held that the products were not in competition with one another. It also found no likelihood of confusion. Accordingly, there was no reason to issue the injunction which would render the defendant's inventory and promotion of the product worthless and would jeopardize the defendant's relationship with its customers.

In the case at bar, there is a likelihood of confusion as to Plaintiff's approval and authorization of Defendant's goods, and the sale of Volpone's remaining inventory would be in direct competition with any licensed Nolan Ryan products. In addition, unlike the cases cited by Defendant, Volpone claims that Ryan breached the licensing agreements. If Defendant proves correct, it will recover money damages suffered as a result. Thus, Volpone's interest in liquidating its inventory cannot compare with Ryan's loss of control over his reputation and the potential interference with his ability to license his name and image to others. *See* discussion *infra* Part VII.B.; *see also, Hillerich & Bradsby Co. v. Christian Brothers, Inc.*, 943 F.Supp. 1136, 1142 (D.Minn.1996) (holding that potential harm such as loss of goodwill and injury to reputation is irreparable

harm and, therefore, outweighs damage from lost sales which is recoverable).

Lastly, Volpone cannot complain of hardship resulting from a situation which it is largely responsible for creating. Had Defendant continued to pay royalties and sued for partial breach, it would have continued to enjoy the license for which it had contracted. Instead, Volpone failed to make its minimum guarantee payments thereby forfeiting its right to sell Nolan Ryan products. As explained in *S & R Corp. v. Jiffy Lube International, Inc.*:

> Though Durst admittedly presents a sympathetic position, he has brought much of the difficulties of which he complains upon himself. He chose to stop paying royalties ... In choosing to stop his own performance under the contract, he effectively terminated the franchise agreement. Durst is certainly harmed by the threat of loss of his franchise, but his self-inflicted harm is far outweighed by the immeasurable damage done Jiffy Lube by the infringement of its trademark. Durst is not prevented from seeking damages but he has not established the right to continue using the trademark.

*S & R Corp.*, 968 F.2d at 379 (internal citations omitted). Accordingly, and for the reasons further explained below, the balance of the equities tips decidedly in Plaintiff's favor.

### B. *Irreparable Harm*

In order to warrant injunctive relief, Plaintiff must also demonstrate that it will suffer irreparable harm absent such relief. There is no doubt that Plaintiff has satisfied this requirement, for a finding of irreparable harm necessarily follows from the discussion above. *See Southland Corp.*, 41 F.Supp.2d at 242 (holding that if the franchise agreement was properly terminated, defendant's license to use plaintiff's trademarks was also revoked, and irreparable harm is established as a matter of law). The Second Circuit has held that:

> establishing a high probability of confusion as to sponsorship almost inevitably establishes irreparable harm ... The implication of the phrase that irreparable harm "almost inevitably" follows from likelihood of confusion leaves the door slightly ajar perhaps for those few cases in other trademark contexts where irreparable harm does not follow ... But in a licensor/licensee case the reasons for issuing a preliminary injunction for trademark infringement are more compelling than in the ordinary case. When in the licensing context unlawful use and consumer confusion have been demonstrated, a finding of irreparable harm is automatic.

*Church of Scientology International*, 794 F.2d at 42. For the reasons already stated unlawful use and a likelihood of consumer confusion have been demonstrated in the case at bar.

The facts in the present case are similar to those in *Church of Scientology International*. There, the plaintiffs licensed their marks to defendants and subsequently terminated that license after defendants refused to accept an increase in the licensing fee. Although defendants failed to pay the required tithe, which is, in effect, a nonsecular royalty, they continued to operate their branch of the church. Plaintiffs commenced an action for infringement and were granted a preliminary injunction.

In an effort to pinpoint the harm, the Court of Appeals stated that "irreparable harm exists in a trademark case when the party seeking the preliminary injunction shows that it will lose control over the reputation of its trademark pending trial. Control of the trademark is crucial in the licensing context because a licensor who fails to monitor its mark risks a later determination that it has been abandoned." *Id.* at 43 (internal quotations and citations omitted). In addition, "[t]he unauthorized use of a mark by a former licensee invariably threatens injury to the economic value of the goodwill and reputation associated with a licensor's mark." *Id.* The Court

of Appeals did not require the plaintiffs in *Church of Scientology International* to demonstrate actual harm to their reputation. The mere loss of control over that reputation is what constituted the requisite irreparable harm. *Id.* at 43–44; *see also, Opticians Association of America v. Independent Opticians of America,* 920 F.2d 187, 195 (3rd Cir.1990) (collecting cases) ("plaintiff's mark is his authentic seal . . . If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use" (internal quotations and citations omitted)).

Nolan Ryan earns substantial revenue through the licensing of his name and image. However, if companies such as Volpone can exploit his celebrity without his consent, his years of accomplishments on the baseball field will quickly lose their commercial value off the field. "For, in an age where star athletes make tenfold more from their endorsement contracts than from their team salaries, it denies reality to believe other than that an individual's persona can constitute valuable economic property. Moreover, the nature of that property is such that its value is diluted by unauthorized use." *Jim Henson Productions, Inc. v. John T. Brady & Assoc., Inc.,* 867 F.Supp. 175, 189 (S.D.N.Y.1994); *see also Church of Scientology International,* 794 F.2d at 44 ("once a trademark owner loses control of its mark by failing zealously to watch over its use by others—or by not objecting to its unauthorized use—the reputation associated with the mark is reduced"). "The probability of serious dilution in the value of the marks by any unauthorized use on the part of defendants provides an adequate basis for a finding of irreparable injury." *Murjani International,* 1987 WL 15110 at 12.

In *Murjani International, Ltd. v. Sun Apparel, Inc.,* the court granted a preliminary injunction where the defendants continued to use marks in association with a clothing line after their license to use the marks was terminated. Addressing the issue of irreparable harm, the court stated that "control over the use of the marks is essential to the preservation of value and integrity associated with these marks. If defendants exploit the marks, plaintiff would undoubtedly suffer irreparable harm based upon the dilution of the trademarks' values, as well as a loss of reputation and goodwill among the other entities who are granted the right to use the trademarks and who depend upon Murjani to protect the integrity and value of these marks." *Murjani International,* 1987 WL 15110 at 12. Similarly, if Volpone is allowed to continue to sell Nolan Ryan products, not only will the value of Plaintiff's name be diluted threatening his ability to license his name and image, but his relationship with existing licensees will be jeopardized.

 Defendant argues that Plaintiff's claims of irreparable harm are belied by his delay in seeking a preliminary injunction. As Defendant points out, Plaintiff purported to terminate the licensing agreements on August 10, 1999, but did not move for a preliminary injunction until October 18, 1999, slightly over two months later. However, along with the notice of termination Plaintiff demanded that Defendant cease and desist from using Ryan's name, likeness and signature. Almost immediately thereafter Plaintiff commenced this infringement action. Plaintiff repeated the demand to cease and desist on October 7, 1999 by means of a letter to counsel for the Defendant. A delay in moving for a preliminary injunction might undermine a case for irreparable harm where the delay is unexplained and the moving party's conduct evinces a lack of urgency and concern over defendant's actions. In the case at bar, Plaintiff expressed its objections to Defendant's continued use of his name and image on at least two occasions and promptly commenced the instant action. *See King v. Innovation Books, a Division of Innovative Corp.,* 976 F.2d 824, 831 (2nd Cir.1992) (excusing eight month delay where plain-

tiff objected to defendant's actions repeatedly during that time).

In addition, the parties entered a stipulation, allegedly upon Defendant's request, to extend the date by which Defendant was required to respond to the complaint. As part of that stipulation Defendant agreed that the stipulation and the extension of time "shall not be interposed or cited by defendant for any purpose in connection with any subsequent proceedings involving a request by plaintiff for injunctive relief." (Reply Aff. of Martin S. Hyman, Exh. A). Plaintiff postponed its motion in the hopes that settlement negotiations might ensue. It is disingenuous of Defendant to now argue that the two month delay, the same extension of time it requested and promised not to use against Plaintiff, is a basis for denying injunctive relief. The cases cited by Defendant involved longer delays and/or a lack of vigilance on the moving party's part. In light of the circumstances of this case, I am not persuaded that the two month delay in moving for the preliminary injunction undercuts Plaintiff's contention that it will suffer irreparable injury absent such relief. This is not a case of Plaintiff sleeping on his rights.

For the aforementioned reasons, Plaintiff has demonstrated irreparable harm and the motion for a preliminary injunction is granted.

## VIII. *CONCLUSION*

Defendant's motion to dismiss for lack of subject matter jurisdiction is denied.

Defendant's motion to dismiss in deference to the pending state action is denied.

Defendant's motions to dismiss counts one and two of the complaint for failure to state a claim upon which relief can be granted are denied.

Defendant's motion to dismiss count eight of the complaint for failure to state a cause of action is granted to the extent the claim is based on common law. Count eight of the complaint states a viable cause of action to the extent it is based on N.Y. Civil Rights law § 51.

Defendant's motion to dismiss for failure to join indispensable parties is denied. Mattgo Enterprises, Inc. shall be joined as a party to this action in accordance with this opinion.

Plaintiff's motion for a preliminary injunction is granted. Counsel for Plaintiff are directed to settle an order of preliminary injunction consistent with this Opinion not later than August 18, 2000, and upon seven (7) days' notice.

Counsel for the parties are instructed to attend a status conference in Room 17C, 500 Pearl Street at 2:00 P.M. on September 8, 2000.

It is SO ORDERED.